IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

DAINGEAN TECHNOLOGIES, LTD.,    (   CAUSE NO. 2:23-CV-347-JRG
                                )
            Plaintiff,          (
                                )
vs.                             (
                                )
T-MOBILE USA, INC.,             (
et al.,                         )   MARSHALL, TEXAS
                                (   JULY 11, 2025
            Defendants.         )   8:00 A.M.
_____


VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov


Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:    ALAVI & ANAIPAKOS, PLLC
                      609 MAIN STREET, SUITE 3200
                      HOUSTON, TEXAS  77002
                      (713) 751-2363
                      BY:  MR. AMIR ALAVI
                           MR. DEMETRIOS ANAIPAKOS
                           MR. SCOTT CLARK

                      HEIM, PAYNE & CHORUSH, LLP
                      609 MAIN STREET, SUITE 3200
                      HOUSTON, TEXAS  77002
                      (713) 221-2000
                      BY:  MR. BLAINE LARSON
                           MR. MICHAEL HEIM
                           MR. ERIC ENGER
                           MR. ROBERT BULLWINKEL

                      MILLER FAIR HENRY, PLLC
                      1507 BILL OWENS PARKWAY
                      LONGVIEW, TEXAS  75604
                      (903) 757-6400
                      BY:  MS. ANDREA FAIR
                           MR. GARRETT PARISH

FOR THE DEFENDANTS:   MCKOOL SMITH, PC - DALLAS
                      300 CRESCENT COURT, SUITE 1500
                      DALLAS, TEXAS  75201
                      (214)  978-4000
                      BY:  MR. WARREN LIPSCHITZ
                           MR. NICHOLAS MATHEWS
                           MR. ALEXANDER CHERN

                      MCKOOL SMITH, PC - AUSTIN
                      303 COLORADO STREET, STE. 2100
                      AUSTIN, TEXAS  78701
                      (512) 692-8722
                      BY:  MR. CHARLES FOWLER

                      MCKOOL SMITH, PC - AUSTIN
                      300 WEST 6TH STREET, STE. 1700
                      AUSTIN, TEXAS  78701
                      (512) 692-8700
                      BY:  MR. JOSHUA BUDWIN

MCKOOL SMITH, P.C. - MARSHALL
104 EAST HOUSTON ST., STE. 300
MARSHALL, TEXAS   75670
(903) 923-9000
BY:  MS. JENNIFER TRUELOVE

THE DACUS FIRM, PC
821 ESE LOOP 323, SUITE 430
TYLER, TEXAS   75701
(903) 705-1117
BY:  MR. DERON DACUS

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS   75670
(903) 923-8546

1207

THE COURT:  Be seated, please.

Counsel, are the parties prepared to read into the record items used during yesterday's portion of the trial?

MS. TRUELOVE:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed to do so.

MS. TRUELOVE:  Certainly there are none on behalf of Defendant Intervenors.

THE COURT:  How about for the Plaintiffs?

MR. LARSON:  Same for the Plaintiffs, Your Honor.

THE COURT:  Thank you, counsel.

My understanding is that the demonstrative base station was going to be used for closing arguments.  Why don't we get it in the courtroom so we don't have to be overly disruptive opening the doors and bringing it in.  Okay?

MR. ANAIPAKOS:  Your Honor, I decided on the fly we can live without it.

THE COURT:  All right.  Nobody intends to use it then?

MR. ANAIPAKOS:  We don't, Your Honor.

THE COURT:  All right.  We'll leave it where it is.

Is there anything from either Plaintiff or Defendant I need to hear from you on before I bring in the jury and give them my final instructions?

MR. ALAVI:  Your Honor, Plaintiffs have nothing at this time.

1208

MR. DACUS:  Nothing from the Defendants, Your Honor.

THE COURT:  All right.  Do we have all eight members of the jury here, Mr. Estess?

THE COURT SECURITY OFFICER:  Yes, Your Honor.

THE COURT:  All right.  Let's bring them in, please.

I want no disruptions during these instructions or arguments.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  Welcome back.  Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I'm now going to instruct you on the law that you must apply.

You're each going to have your own printed copy of these final jury instructions that I'm about to give you orally.  Therefore, there is no need for you to take excessive notes unless you want to because you're each going to have your own printed copy to review during your deliberations.

It's your duty to follow law as I give it to you.  On the other hand, and as I've said, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of this trial or may make in the course of these instructions as an indication that I have any opinion about the facts in this case.

Now, you're about to hear closing arguments from the

attorneys for the competing parties.  Statements and arguments of the attorneys, ladies and gentlemen, are not evidence, and they are not instructions on the law.  They're intended only to assist the jury in understanding the evidence and the parties' contentions.

A verdict form has been prepared for you, and you'll take this verdict form with you to the jury room when you retire to deliberate.  And when you've reached a unanimous agreement as to the answers called for in that document, you will have your foreperson fill in the answers reflecting your unanimous decisions, your foreperson will then date it and sign it on behalf of the jury and then advise the Court Security Officer that you have reached a verdict.

Answer the questions in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  Again, your answers and your verdict must be unanimous.

Now, in determining whether any fact has been proven in this case you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all the exhibits received and admitted into evidence, used over the course of the trial, regardless of who may have produced or introduced them.

You, the jury, are the sole judges of the credibility of

1210

all the witnesses and the weight and effect to give to all the evidence. Now, in deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You alone are to determine questions of credibility and truthfulness of the witnesses.

And in weighing the testimony of the witnesses, you may consider a witness' manner and demeanor on the witness stand, any feelings or interest they may have in the case or its outcome, any prejudice or bias about the case that the witness might have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances.

Has the witness been contradicted by other evidence? Has he or she made statements at other times and other places contrary to what they said on the witness stand? You must give the testimony of each witness, ladies and gentlemen, the amount of credibility that you think it deserves.

You must also keep in mind that a simple mistake does not mean that a witness is not telling the truth intentionally. You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

As I've told you, the attorneys in this case act as advocates for their competing clients, and they have a duty to raise objections when they believe evidence is offered that should not be admitted under the rules of the Court. When the

Court sustained an objection to a question addressed to a witness, then you must disregard that question entirely, you may draw no inference from its wording, and you may not speculate or guess about what the witness would have said if they had been permitted to answer the question.

On the other hand, if the objection was overruled by the Court, then you must treat the question and the answer just as any other question and answer as if no objection had been made.  Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court, in so doing, did not indicate any opinion about the weight or effect of that evidence.

Now, at various times during the trial it's been necessary for the Court to talk with the lawyers outside of your hearing, either here at the bench or by calling a recess and talking to them while you were outside of the courtroom. This happens because during trials things often occur that do not involve the jury.  You should not speculate or guess about what was said during such discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence--that is, the proof of a chain of circumstances that indicates the existence

or non-existence of certain other facts. As a general rule, the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, certain testimony has been presented to you during this trial through depositions. A deposition is the sworn, recorded answers to questions asked to a witness in advance of the trial. If a witness cannot be present to testify in person, or if the rules of procedure otherwise permit, then the witness' testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the parties in this case questioned these deposition witnesses under oath. At that time, a court reporter was present and recorded their sworn testimony. Deposition testimony, ladies and gentlemen, is entitled to the same consideration as testimony given by a witness in person from the witness stand in open court, and you should judge the credibility and importance of deposition testimony to the best of your ability, just as if the witness had appeared and testified in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in

the light of common experience.  Let me say that another way.
You may make deductions and you may reach conclusions that
reason and common sense lead you to draw from the facts that
have been established by the testimony and the evidence in
this case.

However, you should base your decisions on just the
evidence presented and not by anything beyond the evidence,
including your own personal experiences with any particular
products that might be at issue in this case.

Now, unless I instruct you otherwise, you may properly
determine that the testimony of a single witness is sufficient
to prove any fact, even if a greater number of witnesses may
have testified to the contrary, if, after considering all the
evidence, you believe that single witness.

Now, when knowledge of a technical subject may be helpful
to you, the jury, a person who has special training and
experience in that technical field--they're called an expert
witness--is permitted to state his or her opinions to the jury
on those technical matters.  However, ladies and gentlemen,
you're not required to accept the opinions of any expert
witness.  As with any other witness, it is up to you to decide
whether to rely upon their testimony or not.

Now, certain exhibits have been shown to you over the
course of the trial that were simply illustrations.  We call
these types of exhibits demonstrative exhibits, or simply

demonstratives.  Demonstrative exhibits are a party's depiction, picture, model, or other illustration to describe something involved in the trial.  If your recollection of the evidence should differ from the demonstratives, then you should rely on your recollection.

Demonstrative exhibits are sometimes called jury aids, and demonstrative exhibits themselves are not evidence, but a witness' testimony concerning the use of a demonstrative exhibit is evidence.  Now, these demonstrative exhibits, ladies and gentlemen, will not be available for you to view or consider during your deliberations.

In any legal action, facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiff for some issues and on the Defendant for some other issues, and there are two burdens of proof that you must apply to the evidence presented in this case.  As we've already discussed, they are the preponderance of the evidence and clear and convincing evidence.

The named defendant in this case is T-Mobile USA, Inc., who you've heard referred to throughout the trial simply as T-Mobile or as the Plaintiff [sic].  In addition -- I'm sorry.  The Defendant in this case is T-Mobile USA you've heard referred to throughout the trial as T-Mobile or as the Defendant.  In addition to T-Mobile, the Defendant, Ericsson

and Nokia, Ericsson, Inc., and Nokia of America Corporation, have intervened in this case on the side of the Defendant T-Mobile.

Technically, this means that Nokia and Ericsson are known as intervenors.  Practically speaking, though, Nokia and Ericsson are working cooperatively with T-Mobile to defend against the allegations brought by Daingean against T-Mobile. However, to be clear, Nokia and Ericsson themselves have not been accused of infringement by Daingean in this case even though throughout the trial you may have heard T-Mobile, Nokia, and Ericsson collectively referred to from time to time as Defendants.

Now, the Plaintiff in this case is Daingean Technologies, Ltd., who you've heard referred to throughout the trial simply as Daingean or as the Plaintiff.  And the Plaintiff Daingean has the burden of proof of proving patent infringement by a preponderance of the evidence.  The Plaintiff Daingean also has the burden of proving damages for any patent infringement by a preponderance of the evidence.  And, finally, Daingean has the burden of proving patent exhaustion by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

1216

Now, the Defendants have the burden of proving invalidity of the asserted patent by clear and convincing evidence. Clear and convincing evidence means evidence that produces in your mind an abiding conviction in the truth of the party's factual contentions and it produces in your mind a conviction that the party's factual contentions are highly probable.

Proof to an absolute certainty is not required to meet the clear and convincing evidence standard, but that standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard.  If proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as we've previously discussed, these two burdens of proof are not to be confused with a third and altogether different burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and which has no application whatsoever in a civil case such as this.  Beyond a reasonable doubt is a higher standard than both the preponderance of the evidence and clear and convincing evidence.

Now, as I did at the beginning of the trial, I'll first give you a summary of each side's contentions in this case, and I'll then provide you with detailed instructions on what each side must prove in order to win on each of its

1217

contentions.

As we've previously discussed, this is an action for patent infringement.  Daingean, the Plaintiff, contends that T-Mobile, the Defendant, infringes claim 12 of United States Patent No. 8,576,803, which you've heard referred to consistently during the trial as the '803 Patent.  And you've also heard the '803 Patent referred to as the asserted patent.  There have been times you've heard it called the patent-in-suit.  Claim 12 of the '803 Patent hads sometimes been referred to as the asserted claim.

Now, the Plaintiff Daingean contends that T-Mobile has infringed the asserted claim by using in the United States 5G base stations for a communication system in the T-Mobile 5G cellular network.  Sometimes in these instructions I may refer to these base stations as the accused products.  Daingean contends that the accused products infringe claim 12 of the '803 Patent.  Daingean contends that it is entitled to money damages in the form of a lump sum reasonable royalty for T-Mobile's infringement.  Daingean also has the burden to prove these issues by a preponderance of the evidence.

Now, the Defendants deny that the accused products infringe the asserted claim of the '803 Patent.  Defendants deny that T-Mobile owes Daingean any amount of money damages.

Defendants further contend that the asserted claim of the '803 Patent is invalid because it is not new, because it was

1218

obvious, and because it lacks an adequate written description. The Defendants have the burden to prove invalidity by clear and convincing evidence.

T-Mobile and Nokia further contend that Nokia has a license to the '803 Patent that permits Nokia to sell the accused base stations to T-Mobile and that Daingean cannot enforce the asserted claim of the '803 Patent against Nokia base stations because of Nokia's authorized sale of its base stations to T-Mobile exhausts Daingean's patent rights.

Daingean denies that Nokia has a license to the '803 Patent authorizing it to sell base stations to T-Mobile and denies that Nokia's sales of base stations to T-Mobile exhaust Daingean's patent rights.  T-Mobile and Nokia have the burden to prove their exhaustion defense, including whether Nokia is licensed to the '803 Patent, by a preponderance of the evidence.

Now, if you decide that the asserted claim has been infringed and is not invalid, you will then need to decide the amount of money damages, if any, to be awarded to Daingean to compensate it for that infringement which you have found.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims. The patent claims, ladies and gentlemen, are those numbered sentences at the end of the patent.  The claims define Daingean's rights under the law.

The claims are important because it is the words of the claim that define what a patent covers.  The figures and the text in the rest of the patent provide a description and/or examples of the invention and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's coverage.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than any other claim within a patent.  Therefore, what a patent covers depends, in turn, upon what each of its claims covers.

Now, you first need to understand what the claim covers in order to decide whether or not there is infringement of that claim and to decide whether or not that claim is invalid.

Now, the law says that it's my role to define the terms of the claim and it's your role to apply my definitions to the issues that you are asked to decide in this case.  Therefore, as I explained to you at the beginning of the case, I've already determined the meanings of certain claim language and I have provided those definitions or constructions to you in your juror notebooks.

You must accept my definitions of these words from the claim as being correct.  And it's your job to take these definitions that I have supplied to you and apply them to the issues that you are deciding, including the issues of infringement and invalidity.

You should disregard, ladies and gentlemen, any evidence presented at the trial that contradicts or is inconsistent with these constructions and definitions which the Court has given you.  For claim language or terms that I have not construed--that is, limitations that I have not interpreted or defined--you are to use the plain and ordinary meaning of that language as understood by a person of ordinary skill in the art, which is to say, in the field of the technology of the patent at the time of the alleged invention.

The meaning of the words in the patent claims must be the same when deciding both infringement and when deciding invalidity.  And you've been provided with a copy of the asserted patent, the '803 Patent, in your juror notebooks, and you may refer to it and everything else in your juror notebooks during your deliberations.

Now, several times during these instructions, I have referred to or will refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art.  It's up to you, ladies and gentlemen, to decide the level of ordinary skill in the field of the invention.

In deciding the level of ordinary skill in the field, you should consider all the evidence introduced at trial, including but not limited to:

1.  The levels of education and experience of inventors and other persons actively working in the field;

2.    The types of problems encountered in the field;

3.    Prior art solutions to those problems;

4.    The rapidity with which innovations are made; and

5.    The sophistication of the technology.

The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems.

I'll now explain how a claim defines what it covers.

A claim sets forth in words a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a product satisfies each of the requirements in that sentence, then it infringes that claim.  There can be several claims in a patent, and each claim may be narrower or broader than any other claim by setting forth more or fewer requirements.

The coverage of a patent as a whole is assessed on a claim-by-claim basis, and in patent law the requirements of a claim are often referred to as the claim elements.  They're often referred to as well as of the claim limitations.

Now, when a product meets all the requirements of a claim, that claim is said to cover that product, and that product is said to fall within the scope of that claim.  In other words, a claim covers a product where each of the claim elements or limitations is present in that product.  If a product is missing even one limitation or element of a claim, then the product is not covered by the claim.  And if the product is not covered by the claim, the product cannot

infringe the claim.

If a person or a corporation makes, uses, sells, or offers to sell within the United States, or imports into the United States what is covered by a patent without the patent owner's permission, that person or corporation is said to infringe the patent.

To determine whether there is infringement, you must compare the asserted claim as I may have defined it for you to the accused products. You should not compare the accused product with any specific example set out in the patent or with the prior art in reaching your decision on infringement. In deciding infringement, ladies and gentlemen, the only correct comparison is between the accused products and the limitations of the asserted claim as the Court may have construed that claim.

T-mobile is liable for infringement if you conclude that any accused use infringes. You must reach your decision as to infringement based on my instructions about the meaning and scope of the claim, the legal requirements for infringement, and the evidence presented to you by both of the parties, or by all of the parties.

I'll now instruct you on the specific rules that you must follow to determine whether Daingean, the Plaintiff, has proven by a preponderance of the evidence that T-Mobile, the Defendant, has infringed the asserted claim by using the

1223

accused products in the United States.

A patent can be infringed, ladies and gentlemen, even if the alleged infringer did not have knowledge of the patent and without the infringer knowing that what it did was infringement of the claim. A patent may also be infringed even though the accused infringer believed in good faith that what it did was not infringement of the patent.

To prove infringement, the Plaintiff Daingean must prove by a preponderance of the evidence that T-Mobile used within the United States a product that meets each and every limitation of the asserted claim. Again, the asserted claim is claim 12 of the '803 Patent. To determine whether the accused products infringe the asserted claim, you must compare the accused product with each of the limitations or elements of the asserted claim to determine whether all the requirements of that claim are met.

To use a system for purposes of infringement, a party must put the invention into service, that is, control the system as a whole and obtain benefit from it. To infringe a claim that recites capability and not actual operation, an accused device need only be capable of operating in the described mode.

An accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may be capable -- may also be capable of

1224

non-infringing modes of operation.  However, a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim.  If a defendant could not readily activate the allegedly infringing functionality in an accused product, or if it could only infringe if it modified an accused product to operate as recited in the asserted claim, then it does not infringe.

A claim element is present if it exists in the accused product as it is described in the claim language, either as I have defined or interpreted that language for you, or if I did not define it, as its plain and ordinary meaning would be understood by a person of ordinary skill in the art.

Now, if any element recited in a claim is not found in an accused product, then you must find that particular product does not infringe that claim.  But if an accused product has each and every one of the claim elements or limitations, infringement of that claim is shown even if the product contains additional features or elements not required by the claim.

I'll now instruct you on the rules that you must follow in deciding whether or not Defendants have proven by clear and convincing evidence that the asserted claim of the '803 Patent is invalid.  Patent invalidity, ladies and gentlemen, is a defense to patent infringement.  Invalidity and infringement are separate and distinct issues that must be separately

decided by you.

An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to during this trial as the PTO or the Patent Office, acted correctly in issuing the patent.  This presumption of validity extends to all issued United States patents.

In order to overcome this presumption of validity, the Defendants must establish by clear and convincing evidence that the asserted claim is invalid.  Therefore, you, the jury, must decide whether Defendants have proven that the asserted claim is invalid.

Now, claims are construed in the same way for determining infringement as for determining invalidity.  And you must apply the claim language consistently and in the same manner for the issues of infringement and for the issues of invalidity.

Now, as I explained earlier, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art.  Prior art may include items that were publicly known or that had been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.  Prior art also includes the knowledge or use of an invention by a person of ordinary skill in the

art in the United States prior to the date of the invention.

In evaluating the prior art to determine whether invalidity has been proven by clear and convincing evidence, you may consider whether that prior art was or was not before the Patent Office.  If you find that prior art which was not before the Patent Office is probative, then you may weigh that prior art when considering whether Defendants carried their burden of proving invalidity.

In deciding validity, the only correct comparison is between the prior art and the limitations of the asserted claim.  It is improper to compare the prior art to the accused product.

I'll now instruct you on how to determine whether the asserted claim of the asserted patent is invalid as being anticipated.  In order for something to be entitled to a patent, the invention must actually be new, and the inventor must not have lost his or her rights by delaying the filing of an application claiming the invention.  In general, ladies and gentlemen, inventions are new when the identical product has not been made, used, or disclosed before.

Defendants contend that claim 12 of the '803 Patent is invalid because the claimed invention is not new.  In other words, Defendants contend that the asserted claim is anticipated by the prior art.  Anticipation requires all elements of a patent claim to be disclosed in a single prior

art reference.

Also, the single prior art reference must disclose all the elements of the claim arranged or combined in the same way as in the claim, as the claim has been construed or interpreted by the Court.  Defendants must prove by clear and convincing evidence that the asserted claim was anticipated by the prior art reference.

Now, to anticipate the invention, the prior art does not have to use the same words as in the claim, but all the elements or requirements of the claim must have been disclosed, either expressly or impliedly, to a person of ordinary skill in the art of the technology of the invention, so that looking at that one prior art reference, that person could make and use the claimed invention.

Keep in mind that the Defendants may not establish anticipation by arguing that the accused product practices the prior art, or by comparing the accused products to a prior art reference.

Defendants also contend that the asserted claim, claim 12 of the '803 Patent, is invalid as being obvious.  I'll now instruct you on how to determine whether the asserted claim is invalid as being obvious.

Even though an invention may not have been identically disclosed or identically described in a single prior art reference before it was made by an inventor in order to be

patentable, the invention must also not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

The Defendants have the burden of establishing obviousness by showing by clear and convincing evidence that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the technology of the patent.

Now, in determining whether a claimed invention was obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

The existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions, ladies and gentlemen, rely on the building blocks of prior art. The skill of the actual inventor is not necessarily relevant because inventors may possess something that distinguishes them from persons having ordinary skill in the art.

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art. The scope and content of the prior art for deciding whether the invention was obvious include at least the prior art in the same field as the claimed invention. It also

includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Further, teachings, suggestions, and motivations may also be found within the knowledge of a person of ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together like the pieces of a puzzle.  The person of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the prior art.

Now, in considering whether the claimed invention is obvious, you may, but you're not required to, find obviousness if, at the time the invention was made, there was a reason that would have prompted a person having ordinary skill in the field to combine the known elements in a way the claimed invention does, accounting for such factors as:

1.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.  Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.  Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

1230

4.   Whether the prior art teaches away from combining elements in the claimed invention;

5.   Whether it would have been obvious to try the combination of elements in the claimed invention, like when there is a design need or market pressure to solve a problem, and there are a finite number of identified predictable solutions; and

6.   Whether the change resulted more from design incentives or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success in combining the teachings of the prior art to result in the claimed invention.

In making these assessments, you should account for any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention, and afterwards, that may shed light on the obviousness or not of the claimed invention.

The following are possible secondary considerations, but it's up to you to decide whether secondary considerations of non-obviousness exist at all:

1.   Whether the invention was commercially successful as the result of the merits of the claimed invention rather than the result of design needs or market pressure, advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether others in the field praised the claimed invention.

These factors are relevant only if there is a connection or a nexus between the factors and the patented features of the invention.  The Plaintiff Daingean has the burden of establishing this connection or nexus.  Moreover, if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all the other evidence in the case in determining whether Defendants have proven that the claimed invention would have been obvious.

In support of obviousness, you may also consider whether others independently invented the claimed invention at roughly the same time as the date of the invention.  In making these determinations, a person of ordinary skill uses simple common sense and can rely upon the inferences and creative steps that a person of ordinary skill in the art would employ.

Also, Defendants do not need to show that one of ordinary skill would actually have combined the physical structures of two references, as long as it would have been obvious to a person of ordinary skill in the art to combine the teachings at the time of the invention.  In determining whether the claimed invention was obvious, do not use hindsight, ladies and gentlemen, and consider only what was known at the time of

the invention.  In other words, you should not consider what a person of ordinary skill in the art would know now or what has been learned from the teachings of the asserted patent.

The Defendants also contend that the asserted claim of the '803 Patent is invalid for failure to provide an adequate written description of the full scope of the claim. Defendants must prove by clear and convincing evidence that the '803 Patent does not describe the full scope of the asserted claim.

As I previously explained, to obtain a patent, one must first file an application, a written application with the United States Patent and Trademark Office, the PTO.  The process of obtaining a patent is called patent prosecution. And the application submitted to the PTO includes and must include within it what is called a specification.

The patent law requires that a patent specification contain an adequate written description of the claimed invention.  When determining whether the specification meets this requirement, you must view the claim as a whole.  The written description requirement is satisfied if persons of ordinary skill in the field of the invention would recognize, from reading the patent specification (which includes the originally filed claims), that the inventor possessed the subject matter finally claimed in the patent.

To succeed on its claim of lack of adequate written

description, the Defendants must show by clear and convincing evidence that a person having ordinary skill in the field reading the patent specification as of June the 1st, 2007, would not have understood that the specification describes the full scope of the invention as it is claimed in the claims of the issued patent.  If a patent claim lacks adequate written description, it is invalid.

In deciding whether the asserted claim of the '803 Patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of the technology of the patent as of June the 1st, 2007.  The specification must describe the full scope of the claimed invention, including each element thereof.

The written description does not have to be in the exact words of the claim.  The requirement may be satisfied by any combination of words, structures, figures, diagrams, formulas, et cetera, contained in the patent specification.  Adequate written description does not require either examples or an actual reduction to practice of the claimed invention.

However, a mere wish or plan for obtaining the claimed invention is not adequate written description.  Rather, the level of disclosure required depends on a variety of factors, such as the existing knowledge in the particular field, the scope and content of the prior art, the maturity of the

science or technology, and other considerations appropriate to the subject matter.

T-Mobile and Nokia, ladies and gentlemen, contend that the asserted claim of the '803 Patent is the unenforceable against T-Mobile's Nokia base stations under the doctrine of patent exhaustion.  When a patented article is first sold by the patent owner or with the patent owner's permission, the rights of the patent owner in that article are exhausted.  Patent exhaustion is an affirmative defense to patent infringement.

To prevail on the defense of patent exhaustion, T-Mobile and Nokia must prove both of the following by a preponderance of the evidence:

1.  That under the 2017 Patent Cross License Agreement between Nokia and Mitsubishi, Nokia was authorized to sell, and did sell, its base stations to T-Mobile.  To prove that Nokia was authorized to sell its base stations to T-Mobile under the 2017 Patent Cross License Agreement, T-Mobile and Nokia must prove that the '803 Patent is an essential patent under the following provisions of that agreement:

Paragraph 1.04 of the agreement which reads as follows: Essential patents or essential as applied to a patent means those claims or other divisible portions of any one or more patents, to the limited extent only that infringement or use of such patents cannot reasonably be avoided in remaining

compliant with any of the standards either for technological reasons or for lack of commercially-viable technical alternatives.

2.  The only reasonable and intended use of Nokia's base stations is to practice the '803 Patent, and the base stations include all of the inventive features of the asserted claim.

Now, this patent exhaustion affirmative defense does not apply to T-Mobile's use of Ericsson base stations.

If you find that the accused products infringe the asserted claim, and that asserted claim is not invalid, you must then consider what amount of damages, if any, to award to the Plaintiff for that infringement.

I'll now instruct you, ladies and gentlemen, about the measure of damages, but by instructing you on damages, I am not suggesting which party should win this case on any issue. If you do not find that T-Mobile infringed the asserted claim or if you find that the asserted claim is invalid, then the Plaintiff Daingean is not entitled to money damages.

Daingean has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that the Plaintiff establishes it more likely than not suffered as a result of T-Mobile's infringement.  While the Plaintiff Daingean is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.

1236

Daingean is not entitled to damages that are speculative, damages that are only possible, or damages that are based on guesswork.

The damages that you award, if any, must be adequate to compensate Daingean for any infringement you may find.  You must not award Daingean more damages than are adequate to compensate for the infringement.  You must not include any additional amount for the purpose of punishing T-Mobile or for setting an example.

I'll now instruct you on how to calculate reasonable royalty damages.

In this case, Daingean seeks damages in the form of a lump sum reasonable royalty.  The patent laws provide that damages for infringement may not be less than a reasonable royalty.  A royalty, ladies and gentlemen, is a payment made to a patent holder in exchange for the right to use the claimed invention.

A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time when the infringement first began.  Because Mitsubishi owned the '803 Patent when the alleged infringement first began, the hypothetical licensor in the hypothetical negotiation would have been Mitsubishi, and the hypothetical licensee in that hypothetical negotiation would have been T-Mobile.

Evidence of things that happened after infringement first began can be considered in evaluating the reasonable royalty, but only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation just prior to when first infringement began.

Now, the parties agree that the damages you award, if any, should be a lump-sum royalty.  A lump-sum royalty is when the infringer pays a single, one-time price for a license covering both past and future infringing sales for the life of the patent.  Thus, if you find that Daingean is entitled to damages, then the damages you award, if any, should reflect the total amount necessary to compensate Daingean for T-Mobile's past and future infringement.

In considering this hypothetical negotiation, you should first focus on what expectations of the licensor (Mitsubishi) and the licensee (T-Mobile) would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.  You must assume, ladies and gentlemen, that both parties believed the asserted claim was valid and infringed, and that both parties were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either would have preferred.

Now, the law requires that any damages awarded to the

1238

Plaintiff correspond to the value of the alleged inventions within the accused products, as distinct from other unpatented features of the accused product or other features such as marketing or advertising, or T-Mobile's size or market position.  And this is particularly true where the accused product has multiple features and multiple components not covered by the patent, or where the accused product works in conjunction with other non-patented items.

Therefore, the amount you find as damages must be based on the value attributable to the patented technology.  If the unpatented features contribute to an accused product, you must apportion the value to exclude any value attributable to unpatented features.  You must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention standing alone. Daingean bears the burden to establish the amounts attributable to the patented features.

Now, in determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determinations are as follows:

The royalties received by the patentee for the licensing of the patents-in-suit proving, or tending to prove, an established royalty.

1239

The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.

The duration of the patent and the term of the license.

The established profitability of the product made under the patent; its commercial success; and its current popularity.

The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or similar features or improvements added by the infringer.

The opinion testimony of qualified experts.

And the amount that a licensor such as Mitsubishi (the

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

owner of the '803 Patent at the time) and the licensee (such as T-Mobile) would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement--that is, the amount that a prudent licensee who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors referred to during the trial as the *Georgia-Pacific* factors.  No one of these factors is dispositive, ladies and gentlemen, and you can and you should consider the evidence that's been presented to you in this case on each of these factors.  You may also consider any other factors which in your minds would have increased or decreased the royalty T-Mobile would have been willing to pay and that the patent owner at the time, Mitsubishi, would have been willing to accept, with both acting as normally prudent business people.

Now, when determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for the rights to the patent in question or for rights to similar technologies.  Comparable license agreements are one factor that may inform your decision as to the proper

amount and form of the reasonable royalty award.  Such licenses may indicate the patented invention's economic value in the marketplace.

A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between the patent owner and the alleged infringer in order for you to consider it.  However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license, such as whether they involve comparable technologies, comparable economic circumstances, comparable structure, and comparable scope when you make your reasonable royalty determination.

In the context of the hypothetical negotiation, it is not necessarily the case that each patent covered by other licenses that were presented contributes equally to the amount that was paid for those licenses.

Now, in determining a reasonable royalty, you may also consider whether there were commercially-acceptable non-infringing alternatives to the '803 Patent that were available at the time of the hypothetical negotiation and whether those would have affected the reasonable royalty the parties would have agreed upon.

In considering the evidence of a reasonable royalty, you are not required to accept one specific figure or another for

1242

the reasonable royalty.  You're entitled to determine what you consider to be the reasonable royalty based on your consideration of all the evidence presented by the parties whether that evidence is of a specific figure or a range of figures.

08:47    In calculating damages, you may only award damages to the Plaintiff Daingean for infringement that occurred after the damages period begins.  The damages period for issues related to infringement of the '803 Patent began no earlier than March the 7th, 2022, and run through, but not later, than January the 9th, 2028, which is the expiration date of the '803 Patent.

08:47    Now, ladies and gentlemen, having given you those instructions, we will now hear closing arguments for counsel for the competing parties.  The Plaintiff may now present its first closing argument.

Would you like a warning on your time, Mr. Anaipakos?

MR. ANAIPAKOS:  Yes, Your Honor.  I intend to go for about 28 minutes and if the Court would be kind enough to warn me at 23 minutes used.

THE COURT:  I will warn you when you have used 23 minutes.

MR. ANAIPAKOS:  May I approach, Your Honor?

THE COURT:  You may approach and you may proceed with Plaintiff's first closing argument.

1243

MR. ANAIPAKOS:  May it please the Court.

Good morning, everybody.  We're at the end of a long week.  We showed up at this courtroom every day, rolled up our sleeves, and got ready to work.  And so did you and we noticed.  Hours of Dr. Feuerstein walking you through very complicated technology, Dr. Kowalski using Ericsson and Nokia's own documents to show you how important this invention is.  Our case was about the details and the evidence and the hard work.

But during this week you've also experienced a little bit of what we've experienced for the last two years.  You see, when you sue one of the country's top wireless carriers and they team up with two of the leading tech companies in the world, they try to win at any cost.  And their defense in this case has largely been about half truths, deception, and diversion.  I'll show you how this happened in this trial time after time after time, and it started literally the minute you met T-Mobile.

Think about jury selection.  What did T-Mobile tell you right out of the gate about this patent lawsuit?  They told you that Daingean's patent was valid only on a preliminary basis.  They said it like it was true, a company that has thousands and thousands of its own patents.  You now know from witnesses at this trial and, more importantly, from the instructions the Court has just given you, that there is

1244

nothing preliminary about Daingean's patent.  Nothing at all.

So do we shrug that off as just a mistake, a slip of the tongue?  But then it happens again and again.  Whether it was wheeling in a base station into this court, remember that, the show and tell?  They told you everything they could about that base station except one thing:  It has absolutely nothing to do with this case.  That base station is what we call an N77 base station, and it cannot operate on T-Mobile's network.  Never has, never will.

Does T-Mobile really bring in the wrong base station by accident?  Do we shrug that off as another mistake, too?  So it's the small things, but it's also the big things.

They try to convince you that an invention that saves them 22 to 30 percent of their spectrum for free is somehow worth less than the experts they paid to be here, 30 percent of the same spectrum, up to 30 percent, that you now know the evidence is they spent $12.24 billion to buy.

So the deception gets bigger.  Remember how they tried to dodge how many of their base stations had EIS on them?  First it was, oh, it's one or two in New York for five or ten minutes.  Then it was maybe it's two or three.  Eventually they had to agree that there are -- that EIS is on 37,070 of them right this very second.

And EIS, or RAIT, is the biggest deception of all.  This award-winning feature that they spent all this time and money

testing, great result after great result, that they now want you to believe they decided to pump the brakes on.  We're going to talk about that in greater detail.  But when you sit back and think about this case, T-Mobile's trying to persuade you not to look at the documents that you can pick up and see and read and feel; instead, they want you not to believe your lying eyes and believe their scripted testimony instead.

This is an important case about real technology.  It's complicated and it needs careful attention, which is why we are relieved that it's finally with you.  When you do what the Court's instructed you to do, which is review the evidence and use your common sense, the truth is easy enough to see, and it's compelling.

Ask yourselves, why did all these witnesses for T-Mobile keep telling you that if you find they don't infringe, then you don't have to consider Nokia's license defense or decide damages at all?  Because they're trying to convince you to short-cut your review of this complicated case, to be tempted to start your weekend early, to avoid the complicated issues.

But we're confident you're going to work as hard in deliberations as you have all week.  So let's get into it and start reviewing the evidence you've seen, and we're going to start with the infringement.

This case was presented to you by a remarkable expert. He's sitting in the courtroom today.  Dr. Feuerstein is not a

professional witness.  He's a true industry expert with more than 35 years of in-the-field experience.  He rarely testifies.  He's a professional engineer, not a professional witness.

Dr. Van der Weide is the opposite.  Sure, he's very smart, but he's a professional witness hired by wireless companies all the time.  You heard him testify that in some of his -- in some years, half of his income is generated that way.  He spent less than a year at Motorola and hasn't worked in the industry since.

Dr. Feuerstein and Dr. Kowalski also here today have been in this industry for more than 70 years working in this very field.

The Court has instructed you that T-Mobile is liable for infringement if any accused use infringes.  We have demonstrated to you that the five accused features in this case infringe the '803.  To win on infringement, we only need to prove that any one of those five infringes.  We've proved that all five do.

There are five infringing features and you now know them well.  Three are made by Ericsson and two are made by Nokia.  One of them, EIS, is the latest and greatest, and the other four are the established MIMO features at the heart of T-Mobile's network.

You don't have to take my word for it, however.  The

1247

documents will prove that it's true.  This map shows those four infringing MIMO features, and our experts calculated that T-Mobile has them on more than 30,000 base stations this very day.  That evidence is not disputed.

You know claim 12 well by now, and I'm not going to review every claim limitation with you even though we did that during this trial.  Instead, I'm going to focus on where the fight really was, and that's on three of the claim limitations on the screen.

The first one is 12[C] and the phrase 'not directed to.'  Dr. Feuerstein showed you that Ericsson and Nokia used UE-specific beams that are narrow, they're customized, they're tailored and focused.  He explained how the narrowing and the focusing of these beams causes them also not to be directed to other mobile phones.

Think about it this way.  You've heard of these lobes that come from the base station.  If you direct them towards one phone, you also direct them away from other devices.

Dr. Feuerstein considered lots of evidence, and here are some of the examples.  Now, lucky for you, I don't have time to go into all of them again, but if you want to review them during deliberations, they'll be there for you.  This is Plaintiff's Exhibit 6, 13, and Joint Exhibit 3 on the screen.

The same is true for EIS.  He walked you through the documents and the evidence.  While their expert drew pictures

1248

on a whiteboard, Dr. Feuerstein went through document after document after document, including confidential source code. Dr. Van der Weide never showed you any source code. Ask yourselves why.

Of course, we showed you lots of evidence that Nokia also meets this limitation. Examples are on the screen for you.

We showed you that limitation 12[C] is met. Even Dr. Van der Weide agreed that the lobes are directed to the mobile subscriber station. His trial testimony is on the screen.

You remember Plaintiff's Exhibit 13? It was the one with all the colored lines bouncing around? All of those roads eventually lead to the phone. Every single one of them. Is that by accident? Of course not. That's because all of the beams are being directed there, albeit in a variety of different ways. This is important. By directing the lobes to a target handset, you are not directing them to adjacent handsets. That's the point.

The second major disagreement was over 12[E], but the testimony and the documents show you that these channel estimation signals we've heard so much about are received at the base station. T-Mobile tells you that a signal is not received if the base station doesn't know that it's a channel estimation signal. Does that make any sense? Of course not. Is that what claim 12 requires? No, it's not.

Now, Dr. Feuerstein showed you lots of evidence that the

channel estimation signals from adjacent phones are received at the base station and used to generate what they call beamforming weights for Ericsson MIMO feature.  And, again, examples are on the screen.  You probably remember from Dr. Feuerstein.

And here are some of the examples of the evidence you heard about EIS from Plaintiff's Exhibit 14, and then again examples for Nokia's MIMO products.

Mr. Faxér and Dr. Aichmann, they admitted that everything is received.  Mr. Faxér's testimony is on the screen, and he said SRS transmissions will be received as interference, just like the Ericsson documents showed.  Dr. Aichmann makes it clear that the antenna receives everything.

There is no doubt that the information is received at the base station.  Even Dr. Van der Weide admitted it during trial.  Claim 12[E] is met, and we proved that to you.

The third and final limitation really in dispute is 12[F].  T-Mobile's argument ignores, however, how the system actually works.  You heard from Dr. Feuerstein that interference from the adjacent phone is processed to form the beam.  It couldn't be clearer that Ericsson's MIMO feature uses an interference amount.  And how do you know that?  Well, Ericsson calculates something called interference plus noise, or IpN for the SRS channel estimation signal.

Well, if you're calculating interference plus noise, you

obviously have an interference amount.  It's part of the equation.  Nokia in its documents calls it the received power calculation.  EIS has its own term.  But they all do it, and we showed you that through this trial.

Here's the evidence that Dr. Feuerstein reviewed for Ericsson's MIMO on this point, Plaintiff's Exhibit 46, Joint Exhibit 5.  Here's the evidence that he reviewed for EIS and for Nokia.

Now, nothing in the '803 Patent says you have to eliminate all of this intercell interference.  Dr. Van der Weide admitted as much.  T-Mobile tried to argue to you that they don't infringe because we don't eliminate all interference.  Well, that's nonsense.  That is an impossibility.  And the claim, claim 12, doesn't require us to do that.

So we've showed you that each claim limitation was met by each of the five accused features.

Now, before moving on, let's discuss EIS in greater detail because it shows you how desperate T-Mobile's efforts to deceive you have been.

Now, I have rarely agreed with much of what T-Mobile has said during this case, but I couldn't agree more with what they said in opening statement on the screen:  "If people are willing to overreach and stretch in one area, they're usually willing to reach and overreach in another."  To that, I say

amen.  When you walk through the timeline and the evidence on EIS, the message T-Mobile is sending you is very clear.  Don't believe your lying eyes.  Let's review it.

Let's start in February of 2022 in Plaintiff's Exhibit 16, more than three years ago when Mr. Faxér is reporting 40 percent improvements in the so-called smart solution.  Now we're a few months later, in May.  Similar results after EIS has tested in Sweden, Defendants' Exhibit 99.  You saw this with Dr. Kowalski, in May of 2022 T-Mobile reporting on promising results in several situations, including in San Francisco.  EIS has performed well time after time after time.  You saw this press release several times, Plaintiff's Exhibit 32.  Now July of last year, T-Mobile announces to the world in a press release that is on its website today that it had won two major awards at the Mobile World Congress in Barcelona.  That's the biggest event in telecommunications each year.  Mr. Faxér and his team flew to Barcelona to accept the awards.  They announced a successful test on a carrier's live network.  After this, Ericsson starts rolling out EIS to customers all over the world, including to T-Mobile starting with the Q4 of 2024 release.

Ladies and gentlemen, this exhibit, Plaintiff's Exhibit 38, is the smoking gun in this case, and it's one of the most important documents.  Make sure during deliberations that you ask for it.  The way things are going to work is if you ask

for an exhibit, it will be brought to you to review.  So ask to see Plaintiff's Exhibit 38.

Mr. Faxér testified that he wrote this letter with his lawyers, and it comes out of nowhere in September of last year.  We haven't seen a single complaint about EIS yet and there is certainly nothing in this letter.  Yet Ericsson is trying to restrict it when?  Until this legal matter has been resolved.  You didn't know it, but Ericsson was talking about you and planning for you.  And very strangely, Ericsson only restricts it to U.S. customers.  Why would they do that?  If you've got a product that doesn't work, you're going to let customers overseas use it when you're a global customer -- company like Ericsson?  Does that make a lick of sense?

Mr. Faxér and his lawyers screwed up when they wrote that into this letter.  We got a copy of this letter in this lawsuit.  And so what did they do?  They supposedly have some tests in China to create some paper trail that there are actually problems with EIS, a paper trail that has not existed before this time.

So let's take a look at that, Plaintiff's Exhibit 41.  This is December of last year.  These are supposedly test results on EIS.  Now ask yourself, why are they testing something in December if three months earlier in September they had decided to walk away from it?  Why do that at all?

1253

The document has two parts to it.  The first part is something that's customer facing.  Right?  It's something that Ericsson shares.  That's what Mr. Faxér testified to.  And in December Ericsson is telling its customers that EIS has benefits, reducing intercell interference, et cetera, all the stuff you already heard about.  How is that consistent with making the decision to get rid of EIS three months earlier?  It doesn't add up.

But if you ask for Plaintiff's Exhibit 41, and please do, flip through it.  You're going to see what we found out after we got access to the confidential documents in this case.  At page 35, they show the results of these so-called tests in China.  But look at the warning that's included on these pages and only on these pages--do not include this slide in customer presentation.  Why on earth would they do that?  If there are problems with EIS, why is the public part of the same document telling customers exactly the opposite?  How naive do these people think we all are?

Plaintiff's Exhibit 18 makes it very clear what the real plan is.  The moment this lawsuit is over, like they said in September, they're turning on EIS.  Have no doubt about it.  And it's easy to do.  You look at the documents and you're told it can be enabled or disabled on the fly.

The Judge has instructed you, and we believe the jury instructions leave no doubt, that EIS infringes.  They have

1254

already used it to test their networks.  We expect, however, that T-Mobile's going to focus on the last sentence that you see on the screen and argue that they can't really enable it because they're not able to right now.

But you know that EIS is sitting on the base stations right this very second, and if they really wanted to get EIS off of their networks and not use it, they're able to do so very easily.  So why is it there?  Why is it still sitting there right this very second?  Ask yourselves those questions, because it easy to enable or disable on the fly.

Let's talk briefly about validity.  The Judge has explained to you that that's T-Mobile's burden to take away Daingean's property rights, and the burden is clear and convincing evidence.  And they don't come close in this case. This is an easy inquiry and it really focuses on one patent only, this Samsung patent.  They have to show, in order to invalidate the '803, that Samsung discloses each and every element of claim 12.

But here it's easy to see that it does not disclose claim 12[F].  Why?  Because there's no interference amount at the base station to generate a transmission beam.  Dr. Sundaresan walked you through this yesterday.  That's the red X on the base station shown on the screen.

But T-Mobile had a back-up plan, and you heard about it from Dr. Van der Weide.  It claims now that the '803 Patent is

1255

obvious.  And Dr. Van der Weide does exactly what the Court has instructed you that he cannot do, the Court's instructions at the bottom.  He combines references in hindsight using the '803 Patent as his blueprint.  That is forbidden by the Court's instructions.

Let's also discuss this written description defense that they try to make.  The Court's instructions make this very easy to answer.  If you look at the parenthetical, the patent specification includes the originally-filed claims.  Those are the Court's instructions to you.

Now, on the screen I have the originally-filed claim on the right and then the language from the patent on the left. Now, clear as day, it includes an interference amount at the adjacent mobile subscriber station.  Frankly, this is a silly defense, and Dr. Sundaresan walked you through that yesterday.

Let's talk about this Nokia license.  Ladies and gentlemen, Nokia is just trying to deceive you the way they've tried to deceive you throughout the case.  It has never had a license, nobody has testified to the contrary, and Nokia knows it.

Mitsubishi told Mr. Padian the same thing.  The language is on the screen in front of you.  The '803 Patent is not essential to 5G.  This is not a close call.  Every single witness who testified before you agreed.  Remember Dr. Kowalski?  He walked you through the reasons that the '803

is not essential to 5G.  You can have a 5G network without the '803.  If you want to have a better one, you use the '803.

The verdict form is going to ask you if T-Mobile and Nokia have proved this, but T-Mobile told you very clearly how to answer this question.  Question, so if the jurors were looking to you for advice on how to answer the question is the '803 Patent standard essential, T-Mobile's advice is to answer that question N-O.  Right?  Yes.  Even Nokia's witness had to admit that he was not testifying that the '803 was somehow standard essential.  Nobody has testified to that before you.  This is just another silly defense.

So I'll wrap up my comments to you this morning talking about damages.  The law on damages is on the screen, and it requires that a reasonable royalty be awarded upon a finding of infringement.

THE COURT:  23 minutes have been used.

MR. ANAIPAKOS:  Thank you, Your Honor.

So let's talk about who followed the law.  Ms. Bennis did not.  Now, she worked with Paul Carpenter, and I have to admit something--I liked him, too, very charming man, Mr. Carpenter.  The problem is he was given the wrong assignment.  Carpenter doesn't know the value of the IPCom patents, the UC-San Diego patents, or the IP-Bridge patents, and he was very honest about that when asked.  He had done no independent analysis of it.

Something interesting about Mr. Carpenter, however.  He has never -- he has a lot of licensing experience.  He told you about that.  And he's never seen a wireless carrier license like T-Mobile would be taking computed on the cost of the carrier's equipment.  Never seen it once in his career.  Yet that's exactly what Ms. Bennis does in her opinions.  But he did not read her report.  He reviewed the reports of everybody else--Dr. Kowalski, Mr. Dell, but not Ms. Bennis.  Ask yourself why T-Mobile didn't give him that report to review.

Now, Mr. Dell, he followed the law which required you to use the hypothetical negotiation to calculate a reasonable royalty.  You see the parties to that negotiation on the screen in front of you.  This document, Plaintiff's -- this document would be a major topic at that hypothetical negotiation where everyone knows everything.  Remember, it's called the book of wisdom?  There are no hidden cards.

T-Mobile spent $12.24 billion on spectrum.  And now at the hypothetical negotiation, Mitsubishi has a solution to make that extremely scarce and valuable and mission-critical asset much more efficient.  Mitsubishi sits down and says, I know you've spent 12-and-a-quarter billion dollars and I can make that asset up to 30 percent more efficient for you.

We walked you through Mr. Dell's evaluation process in detail and how he apportioned to account for the value of the

1258

'803.  Now, look at that first step in the funnel, the 22.2 to 30 percent?  You remember that Dr. Kowalski's calculations are consistently lower than what we saw in the documents from Ericsson and Nokia's own files, consistently lower.

If he had used their numbers from their testing, the number would be greater.  That's why, as big as this number admittedly is, it's conservative, because when you think about the benefit to their system, you start to understand how important this invention is.

Can we pull up the last slide, please?  Thank you very much.

The total reasonable royalty in this case is exactly $181,469,090.  The Court's going to ask you to break this number down because T-Mobile uses both Nokia and Ericsson equipment.  So you might want to jot down these numbers so you can discuss them later during deliberations.

Now, you're going to hear later from my colleague, Ms. Fair, and she's going to talk to you some more after we hear from T-Mobile's lawyer, but I will stop with this, and that's that we really do thank you for your time and attention this week.  This has been a lot of complicated work.  It's a very important case, and we appreciate all the time, attention, and hard work that you've given us.

Thank you very much.

Thank you, Your Honor.

THE COURT:  All right.  Defendant may now present its closing argument to the jury.  Would you like a warning on your time, Mr. Dacus?

MR. DACUS:  Yes, Your Honor.  Would you let me know when I've used 20 minutes and then when -- would you please let me know when I have five minutes remaining?

THE COURT:  I will do those things.

MR. DACUS:  Thank you so much.

THE COURT:  You may proceed with Defendants' closing argument.

MR. DACUS:  Thank you very much, Your Honor.

Good morning, everyone.  I want to start this morning where I hope I've started each time I've had a chance to talk with you, and that is to say on behalf of myself, on behalf of all of our team, and particularly on behalf of Mr. Caldwell, Mr. Patel, Mr. Faxér, and all the men and women who work at T-Mobile, Nokia, and Ericsson, a very sincere thank you for being willing to serve on this jury.

And I know in talking to these gentlemen last night and getting prepared for today, the thing they most want me to say to you is that that thanks is unconditional.  No matter what your verdict is, that thank you remains.  And it's for a very fundamental reason.

You remember in jury selection the very first thing we talked about was, how does it feel when you're falsely accused

of something, and what is the one thing that you want?  You want someone to take the time to listen to your side of the story, to actually understand what your side of the story is, and then just let the chips fall where they may.  And you've given them that opportunity in this -- during this week by serving on this jury.

I told you from the very beginning that this case is important.  Certainly you now know it's certainly very important to T-Mobile, Nokia, and Ericsson, but from our perspectives it has broader ramifications and implications.  Our U.S. Constitution defines what our patent system is and its purpose, and its purpose is very clear--to promote the progress of science.  It's a large reason why these folks are here defending themselves.  And from our perspective what's gone on this in this lawsuit, what's gone on in this courtroom, is not about promoting the progress of science.

There are two very fundamental principles of our patent system as we talked about that are at issue here.  One is when you receive a patent, whatever your boundaries are, you can't move your fence lines, you can't expand your boundaries to try to cover what other folks are doing.

The second is, if you receive a patent, it needs to be new.  No one could have had that idea or that solution before you applied for your patent.

Now, let's sort of dig into the -- the meat here.  The

very first question you're going to be asked when you go back in that jury room is whether or not these Ericsson and Nokia base stations infringe this '803 Patent.

I'm going to walk through the patent claim in detail. But before we do it, I want to make sure that we've level-set on one thing, and that is, there are five features accused of infringement here.

This first one, interference sensing, the Court just read you an instruction. And, by the way, for those of you who take notes, feel free to take notes while I'm talking. I'm going to point you to some exhibits and to some pages in the Court's instructions. You're certainly not going to offend me when you're writing. I want you to do so. If you're not a note taker, that's fine, too.

But if you look on page 14 of the Court's instructions, what you'll see is that in order to use and thus to be able to infringe, you have to use it in the United States, and if you look at page 14, you actually have to put it into service. That means T-Mobile had to put it into service, and you had to have received the benefit.

Look at the instruction. You know from the evidence with respect to this interference sensing, it has never been used in a T-Mobile network. The only thing that was ever done in the United States was a test in New York City done solely by Ericsson with two base stations for less than one day.

I'm going to show you why none of these infringe, but we know that, with respect to interference sensing, based on the Court's instructions, there is no infringement because it was never used by T-Mobile in the United States.

Now, let's dig into sort of the meat of this thing.  When you go home this weekend, you're probably going to have dreams about this claim language or maybe nightmares.  I'm not sure which one.  But you know that what this claim 12 of this '803 Patent is a very specific base station, very specific type of base station.  And the first thing this base station has to do is not direct -- not direct -- beams to mobile subscriber stations in the contiguous area.  That's what the claim says.

And let me back up a little bit.  This is what the Plaintiff showed you.  This is a slide from what the Plaintiff showed you in their opening.  They said that the problem that this '803 Patent solved was this intercellular interference in 5G networks.  And this is what the Plaintiff showed you in opening.

They said interference is solved, and I wrote these words down specifically, the lawyer said, by narrow, focused beams.  And those narrow, focused beams and they have -- they drew it for you right here, those narrow, focused beams are not directed, not directed, to phones in any of the adjacent cells.  That's what they told you in opening.  That's what they wanted you to believe.

We're going to talk about whether or not that's true, but one thing very interesting, even their own expert Dr. Sundaresan who testified yesterday, and I know a lot of that testimony was dense.  But one thing that came out of it is we asked Dr. Sundaresan, hey, here's the slide the Plaintiff showed in opening with this narrow beam right here.  Is that how you understand the '803 Patent?  Look right here.  Do you agree the solution of the '803 Patent was the creation of focused smart beams that reduce interference with other users?

"I cannot agree with that."  Their own expert doesn't even agree with the way they described it to you.

So let's look at the patent claim.  Remember what we do here is we compare the patent claim to what's done in these base stations and determine whether or not they match up.  So these folks have to prove to you that our beams and the lobes within them are not directed at adjacent mobile subscriber stations.

So here's the evidence.  And I heard their lawyer say that we drew on a whiteboard and we haven't shown you technical documents.  I want you to count the number of technical documents I'm about to show you.  These are documents that come from our files, not -- not created after this lawsuit, that existed long before this lawsuit that show how our systems work.

1264

So this is PX 46, for anybody taking notes, at page 6. And it shows, this red line right here, shows that the way our base stations work, there is interference going to phones in the adjacent area. The very thing they say they have to prove, they can't.

Here is another technical document, DX, Defendants' Exhibit 99 at page 18, showing how the base stations work. You remember that Mr. Lipschitz went through this. He said, here we've got this interference sensing turned off so we're in the MIMO, and the bar right here for showing intercell interference is high. And it is. Look at all these lines. There's all kinds of intercell interference going on.

Now, it doesn't affect our system and I'll explain why, but to say that our beams and lobes are not directed at phones in adjacent cells is just absolutely contrary to the evidence.

Here's more evidence. Lawyer said we weren't showing you technical documents. Here is PX 41 at page 7. Look at it for yourself. It shows exactly what our beams do. You see right here, rather than this narrow beam like they say the '803 Patent is, ours has all these lobes and it's directed at the cell in the adjacent area. I think it's a time to pause just for a second. This is what they told you in opening the '803 Patent was. This is what our base stations do.

Now, you don't have to rely solely on a picture, but it does tell a thousand -- it is worth a thousand words.

1265

Here is more technical documents, Plaintiff's Exhibit 13. You can look at it for yourself.  This is that diagram where we show our beam, an illustration of how it works.  And so remember -- you remember that sort of dialogue when Mr. Faxér was on the stand and their lawyer was asking questions and saying, hey, all these are different beams, and Mr. Faxér said, no, I can't agree; no, I can't agree; and everybody in the courtroom is kind of scratching their head?

The reason is all of these things right here are one beam.  All these various things being shot out are lobes, anywhere between 64 and 96 depending on the number of antennas on the base station.  By the way, that is the type of base station used in the network.  They have a different frequency, but it's the exact type of base station used.

All of these lobes, as you heard from Mr. Faxér, they continue.  They're interfering.  Now, they're at very low power, and that's how we solved this interference problem, by the way.  With all these different lobes, they have less power.  So even though they reach phones in adjoining or adjacent areas, because they have low power, it doesn't impact, it doesn't create poor performance in our system.

One final point on this.  I feel like I'm beating a dead horse, but I think it's important.  You remember when Mr. Feuerstein, their expert, testified, he kept showing these beams like this, this classical beamforming.  But what we know

1266

is in the Nokia and Ericsson base stations, what we actually have are these generalized beamforming. You've seen that from the technical documents.

One very important part, and I'm sure you caught this in Dr. Feuerstein, their technical expert's testimony. He kept showing these very-defined beams from our technical documents and saying, see, here is what they look like. And then when Mr. Lipschitz cross-examined him, he said, Dr. Feuerstein, in that same document you are pointing these folks to, PX 13, you failed to read them the notes that explain exactly how this works. And it's very important. A beam may not look like a beam, like a single directed entity as implied by intuition. It may, in fact, look like an arbitrary blob when there is a significant angular spread in the channel and/or when you're using MIMO. That's exactly what they accuse of infringement.

Yet for simplicity and to focus on the concept of beamforming, illustrations typically show very well-behaved beams with a strong dominating lobe, also in this handbook. But confusion arises when you believe that's the truth. Because how these beams work is they're actually arbitrary blobs.

Dr. Feuerstein never told you that. The very manual he's trying to get you to rely on he doesn't tell you how it actually works. The Judge has told you from the very beginning that you have to judge credibility.

What's the end result of all this?  The end result is the beams in the Nokia and Ericsson base stations and T-Mobile, they don't -- they don't do this.  They don't direct away from phones in the contiguous area.  And because of that, they don't infringe.  And that's enough.  We could literally stop there and be done.

But we're not going to, because there's other ways they don't infringe.  You remember that we've got this little three-ingredient recipe down here, and the second ingredient requires that in order to direct the beam away, which ours don't do, but if they did, you have to take a channel estimation signal from the adjacent mobile subscriber station that is contiguous.  Okay?  So let's talk about that.

You remember we've already talked about what contiguous means.  That's these phones that share the common border with this tower.  It's your next-door neighbor.  So the signals have to come from your next-door neighbor, not your neighbor two houses down or three houses down, from your next door neighbor.

So what happens in the T-Mobile network?  The patent requires the signals come from next-door neighbor.  Is that what happens in the T-Mobile network using Ericsson and Nokia base stations?  Absolutely not.  And by the way, I want you to think about what the Plaintiff said about this issue when we finish talking about it--not a word; not a word did they

dispute this, not during the trial and not now.

The T-Mobile -- let's just start with Ericsson because Ericsson and Nokia accomplish this in different ways.  In the Ericsson system, they use this thing called PCI planning.  No color of this comb in these hexagonal sectors touch each other.  The same color never touches each other.

Dr. Van der Weide explained to you, they call that PCI planning.  Each sector is assigned a number, and as you can see, no blue touches each other.  And what that means is those contiguous -- those phones in that contiguous area are -- cannot and do not talk to the base station because they're doing so at a different time and on a different frequency.  All of this occurring in nanoseconds.

But what the patent describes actually can't happen in the Ericsson base stations and the T-Mobile system.  And it's the same for Nokia.  They accomplish it in slightly different way.  They use these things called combs.  You remember Dr. Van der Weide held up his hand and said, think of these this area between my fingers as a null or a comb.  And when you line those things up, you can talk to the phone in the contiguous area.

But what Nokia does is they misalign them, and the result of that is the base station is talking to the phones in the -- to their next-door neighbor on different frequencies and at different times.

The patent requires that there be a signal received from the contiguous area that cannot even happen, cannot even happen in these base stations and does not happen. And they haven't said one word about it; not a word did they say to you about it to dispute it.

That's a second reason. And by the way, if you find that any of these reasons are valid, as you know they have to match up every single limitation of this claim.

So let's talk about the third ingredient. This is sort of what I call the pink sprinkle on the cookie because they have to show you that what's received is an interference amount, again from the phone contiguous, from the next-door neighbor, not two houses down.

You remember how this happens in the T-Mobile network. You get this main blue primary signal, but then you get all this red interference. And you remember what Dr. Van der Weide said--all this red interference, it doesn't come from the phones contiguous; it can't. The way the system is set up, it can't. All this red interference comes from your neighbor two and three houses down and from many other things--radiowaves, all kinds of things that create interference in the air and atmosphere.

So let's go back to the claim. The claim requires receiving an interference amount from the contiguous phone. We can't do that. We can't do that. In addition to that, it

1270

requires knowing the amount from the contiguous area.  Well, remember that all the interference, all the interference that's being received is coming from contiguous, non-contiguous two or three houses down, and everything else in the atmosphere.

Dr. Van der Weide said, think about that as someone being blindfolded, a bunch of people pouring water into a bathtub, unblindfolding you, and then being asked to identify specifically how much water came from each person.  You can't do it.  We can't do it in T-Mobile because in that interference amount, it's an aggregate amount of all the interference in the atmosphere, all the interference from two and three and four houses down.

And you don't have to believe me.  Look at -- this is Dr. Feuerstein, the Plaintiff's expert.  We asked him, is all that interference, sir, is all that in the aggregate or is it limited to just what's contiguous?  Nope, it's all in the aggregate.

So what's the result of all that?  The result of all that is these base stations don't operate in the same way that the patent describes.  These folks can't move their fence line to claim things that they weren't given a patent on.

The very first question you're going to be asked is whether or not there's infringement of this claim.  The answer to that should be no.  The evidence says the answer should be

1271

no.  And if that's the case, then you're done.

But let me say one more thing before I move from this. Do you remember when Mr. Faxér was on the stand?  Mr. Faxér and Mr. Mathews on our behalf went through in detail why there's no infringement here.  Remember Mr. Mathews drew Xs on there after Mr. Faxér had explained?

I never know when sort of very consequential moments in trials are going to happen.  You remember that the lawyer for the Plaintiff objected to Mr. Faxér testifying about it.  The Judge overruled it so Mr. Faxér explained to you in detail why these base stations work differently.

Do you remember what happened after that?  There sits the engineer and the man who knows more about this than anybody in the courtroom, and do you remember how many questions they asked him about it?  Not a single one.  There sits the guy who knows, and I'm thinking, this is going to get interesting. And they don't ask him a single question.  Why not?  Because they don't want to know the answer.

THE COURT:  Twenty minutes have been used.

MR. DACUS:  Thank you, Your Honor.

If you answer yes to the infringement question, which we don't think the evidence supports, you're going to be asked whether or not this patent is valid.

You know that in order to be valid, the patent has to be new.  And let's make no mistake here, whether I said it's

preliminary or whatever I said, the ultimate decision is with you.  Whether or not they try to shake you off of that obligation and responsibility, I don't know.  But the ultimate responsibility lies with the jury to determine if the patent is valid.

So we have this question, is this '803 Patent, are the ideas in it new?  The patent's filed on June 1 of 2007.  When we started investigating this patent after we got sued, we found Samsung had filed one earlier, October 10 of 2006, which, by the way, that Samsung patent was actually published to the world.  Everyone had a chance to read it as of May of 2007, less than 30 days before the '803 was applied for.  It is some curious timing to say the least.

But what we know about that Samsung patent is it contained every idea, concept, and solution that is in this '803.  The figure itself shows you that these lobes were being directed away from phones in the contiguous area.  A picture is worth a thousand words.  But there's more than a picture here.  We showed you that every single part, in fact it's undisputed, every single part of the claim of this '803 Patent was in the Samsung patent.  Those folks at that table don't even dispute that at all.

The only thing, the only argument they can muster is that, well, the interference amount wasn't shown in the Samsung patent.

Dr. Van der Weide said, wait, that's not true.  If you look at JX 25, that's the Samsung patent, and you look at paragraph 11, there's a formula that tells you exactly how to calculate that interference amount at the base station, and you, the Plaintiff, through Dr. Feuerstein, that's how you say you calculate interference at the phone--through this reciprocity concept.  That's how you, the Plaintiff, the patent owner, have described your patent.  And, therefore, all of the concepts were already in the Samsung patent.

And you know who else agrees that everything was in Samsung?  Dr. Sundaresan.  Again, there was a lot of testimony yesterday, and I'm sure much of it was hard to absorb because there was so much.  But we asked him, if you apply this reciprocity concept under Kim, that's the Samsung patent, reading the patent the way the patent owner says to read it, does that satisfy the requirement of this interference amount?  That could be a possibility.

You know what?  He sure didn't want to say yes.  When you say that's a possibility, it is.  It is.  Everything disclosed in that Samsung patent, as the Judge said, anticipates--anticipates--came before this '803 Patent.  And because of that, the '803 Patent is invalid.

Now, there's this second concept that the Judge told you about called obviousness.  And I thought I heard the Plaintiff's counsel say you can't combine things and that's

1274

precluded.  Go look at the instructions on page 18 and 19.
The Judge told you you can combine patents and you should
combine patents.

And so what -- the reason you should do it here is
because actually Cisco, one of the great technology companies
in this country, also had this interference amount idea
before--before--the '803 Patent.  I heard him say a couple of
times, oh, this is a fallback position.

It's not a fall-back.  This is belts and suspenders.
Samsung patent had everything the '803 had before it.  If
somehow you believe it didn't, here's the suspenders--Cisco
did in a separate patent.  All we're trying to figure out was,
were these ideas disclosed to the public before the '803?  And
they were.  Dr. Van der Weide showed you right here in these
interference tables.  It was calculating and showing the
amount.

You know who else agrees?  Their own expert,
Dr. Sundaresan.  Again, we said to him, Sir, now, I didn't see
in your report that Jin--that's 457, that's the Cisco
patent--that's the patent reference that's in JX 28, I didn't
see you say that that does not teach how to do that
interference amount.

Remember they were referring to that as 12.6.  That's the
whole purpose he's on the stand.  What does he say?  I didn't
really analyze that, sir.

1275

What?  That's the only element you say is missing, and we show you the Cisco patent and say, here it is right here, somebody disclosed it before you filed for the '803, and your response is, I didn't really take a look at it?

I think there's a reason for that.  The upshot of this is the patent is invalid.

And there's a second reason, and it's this thing called written description.  And it's a little more complicated, but I'm going to describe it as succinctly as I can.  And if it's not good, I apologize.

When you get a patent, you make a promise to the government that you're going to explain what your invention is so that others can use it.  That's the purpose behind the patent system.  So what they needed to explain is how this three-ingredient recipe worked.  And we know that when they first applied, they only used the first two ingredients, and the Patent Office said, no, rejected, it's not new, everybody's done it.

So they added the third ingredient.  But when they added the third ingredient, they forgot to do something or they just didn't do it.  I don't know if they forgot or they just didn't do it.  They didn't go back in the patent specification where you're supposed to explain and teach to people how this three-ingredient process works.  They didn't do it.  And you can look all through that specification.  You're not going to

1276

see using interference amount to redirect a beam, and that's what they had to do.

What they tried to show you during the course of this case and what they cross-examined Dr. Van der Weide on is to say, Well, it was really in our initial application. We explained the three ingredients.

Well, think about that. Let's -- the Judge just -- I counted. He said common sense six times in those instructions.

Let's think about this. The Patent Office rejected the first claim because it had only two ingredients, not three. The Patent Office only allowed it once they had the three ingredients. And then they come to court and say to you, Well, we really had the three ingredients in our original claim.

It makes no sense at all because it's not even true. The only interference amount that was discussed in that original patent didn't relate to how to direct the beam. It related to this threshold issue of when to direct the beam. The patent goes how to direct the beam, three ingredients on how to. The only thing that first patent application talked about was two ingredients and then when to do it.

The result of all of this is that if you reach the second question on whether or not this patent is valid, this patent is not new. And we've got to show this by clear and

convincing evidence.  But I'm going to tell you as to whether or not this concept and solution was new, we've proven that beyond a reasonable doubt.  That's not our burden, it's not nearly that high, but there's no doubt these concepts and solutions were not new.

And let me say one very important thing I forgot.  That Samsung patent and that Cisco patent were never reviewed by the Patent Office.  It doesn't matter how long the Patent Office looked at it, if you don't have the right information you can't make the right decision.  We're not saying the Patent Office got it wrong.  We're saying they didn't have enough information.  They never had the Samsung patent, they never had the Cisco patent.  There's no dispute about that.  No one in this courtroom disputes that.

And if you reach this question, this claim 12, this doesn't invalidate the whole patent, just claim 12 of the '803, the evidence says it's invalid.

Let me talk about a subject I don't want to talk about, and that is the money that these folks seek.

I told you at the beginning in opening, I don't know if you remember, but I said I'm not going to talk about damages.  What I asked you to do is just please listen when they get to the part about talking about damages and listen to what we think is overreaching, because you can really learn what a lawsuit's about.  You can really learn a lot about credibility

of folks when we start talking about how much money they want and how they want to calculate it.  And I think that is more true in this case than any I've been in in a long, long time.

This case is about base stations.  Now, they sued T-Mobile.  Right?  And it's probably pretty clear to you by now why they did it--because they wanted to try to grab all the cellular revenues that T-Mobile makes from their cellular customers rather than limit their damages to the amount that these base stations sell for.  I mean, if we just cut to the chase, you've probably figured that out and that's why they did it.

But we don't need to guess as to whether or not this patent relates to the entire network or just base stations. Dr. Feuerstein, the man they just said has all this experience in the industry, he agrees this patent is about the base stations, only the base stations infringe.  But what they want to do is try to reach out and grab revenues that come from the entire network.  There are thousands of components, as you might imagine, in this T-Mobile network beyond base stations; thousands of pieces of equipment beyond the base stations.

I'm going to talk about this Nokia license, but you remember that Ms. Bennis said, Look, if they would have just limited their damages to the amount of revenues that Nokia and Ericsson received for selling these base stations, that would reduce the damages by 95 percent if they just stuck to what's

actually accused.  And that tells you a lot about what we're here about, whether we are here about justice and patents or something else.

And if you wonder exactly how far these folks will go to try to grab money, you really need look no further than this Nokia license.  Mitsubishi told Daingean and Mr. Padian that Nokia could not be on the whitelist, they told them, because they have a license.

Now, Mr. Padian said, Oh, it meant they may have a license.

And I don't know if you remember this or not, but I said to Mr. Padian, Well, once Mitsubishi told you Nokia may have a license, did you ask Nokia if they actually did?  Did you do any analysis or investigation to determine if they did?

And do you remember what he said?  I did nothing.  I did nothing.  I filed my lawsuit.

So you don't need to look any further than this Nokia license to know what's going on here.

The fact is Nokia has a license, just like Mitsubishi told them.  Nokia got a license to any patent.  Right?  For which it was determined that there is infringement.  And by the way if you get to this question, that means you've determined there's infringement--for which it cannot reasonably be avoided in remaining compliant with the standards for technological or for lack of commercially-viable

technical alternatives.

So the question is, we don't say it's standard essential for technological reasons. We say, if anything, there's a lack of commercially-viable technical alternatives. That's exactly what Dr. Feuerstein said; not us. He said there are no commercially-viable alternatives. There's his testimony. If that's true, Nokia has a license. And when you get to this question, if you get to this question on -- it's actually called exhaustion in your question, you should answer that yes. There's a license. And, yes, Nokia is licensed.

Let me talk about the way that the Plaintiff went about calculating damages, and I'll be pretty quick here. You heard when I cross-examined Mr. Dell, I talked to him about comps and about house shopping. And you're probably wondering, well, is that lawyer right? Is he shooting me straight on what the law is or not?

The Judge just read you the instructions. You can go look at them for yourself. I wrote it down there, on page 28 and 29. It's exactly how you go about calculating damages in a patent case--you use comps. Just like you're shopping for a house, something that we've all done, or shopping for a car, something that many of us have done--you use comps.

What do the comps say in this case? I've blacked out the numbers because I don't want to have to seal the courtroom. But people take royalties to these types of patents, similar

patents with similar benefits.  Ericsson and Nokia do it all the time.  There's an entire industry out there.  And here's what those numbers show.  You remember the numbers are about, if I were to show them here, from about $1.75 million to $7 million.  Right?  Now, that $1.75 million is for one full patent, not just one claim.  And those other numbers up to 7, those are actually for dozens of patents.

THE COURT:  Five minutes remaining.

MR. DACUS:  Thank you, Your Honor.

And, by the way, there's a reason that those numbers, $181 million or anywhere near, because remember these base stations, they have thousands of features and components in them, thousands of features.  In fact, in those base stations, there are hundreds of patented components.  You saw Mr. Carpenter say that Ericsson alone has 33 patents related to these things.

So when people are negotiating these licenses, they have to do so with some practical, real-world concept that, hey, I actually have to sell this base station, and it's in a very cost competitive industry.  And if I'm paying hundreds of millions of dollars for one claim of one patent, how in the world am I ever going to do that?  It makes no sense.  That's why these numbers are what they are.  That's why the comps reflect what goes on in the real world, not in a courthouse in Marshall, Texas, where you ask for $181 million.

1282

09:52    Now, they have nitpicked these comps to death. And I bet when they stand up, they're probably going to do it again. But go look at the Judge's instruction. I wrote it down. He said, the comp need not be perfectly comparable. And with no offense to the Judge, no kidding. That's what comps are. I mean, that's how you house shop. It's not exactly the same, but it's close. It shows what a reasonable price is to pay.

And what it shows you in this case is that what Mr. Dell, 09:52 Mr. Padian, and Daingean are asking for, it's the furthest thing from reasonable. Even if you got to this question, which I hope you do not, it is the furthest thing from reasonable and it tells you exactly what this lawsuit is about.

What Mr. Dell did is he overreached on behalf of Daingean and he overstated at every single step. At every step. He started with grabbing all the cell phone revenues of a network 09:53 that includes as a tiny part of it a base station. He goes next to Mr. Kowalski who is supposed to be identifying what is the incremental benefit of this patent. Remember, Mr. Dell even admitted that, Oh, we're only supposed to measure the incremental benefit. That is ingredient three.

Do you remember when Mr. Mathews said to Dr. Kowalski who is doing this 22 percent calculation, Did you analyze, did you isolate that?

Dr. Kowalski looked like a deer in the headlights and

said, I think Feuerstein did that.

No, Feuerstein is the infringement guy.  You're the guy who's supposed to do it.

Then Mr. Dell did sort of, in my opinion, the most egregious thing.  He assumed that this 22 percent increase in throughput somehow equates to a dollar-for-dollar increase in T-Mobile's revenues and profit with zero evidence, zero evidence of that.  It makes no sense at all.

Let me wrap up here.  And I'm just -- I'm not going to flip through any more slides.  I'm just going to kind of talk to you if that's okay.

Our patent system is the greatest system in the world, made this country the greatest innovative country the world's ever seen.  But the purpose is clear.  It's about the progress of science, and the truth is the purpose is left to juries to protect.  It's a pretty big responsibility.

T-mobile, Nokia, and Ericsson absolutely believe in that purpose.  They've got thousands of patents of their own, they spend lots of money, millions of man hours developing their patents.  What's going on in this courthouse is not about the purpose behind our patent system, and it needs to stop.  It needs to stop right now.

Daingean is sort of like a freight train just getting rolling.  And you saw that whitelist that they required and demanded from Mitsubishi.  But that freight train needs to be

stopped in its tracks, and only you can do it.  I can't stop it, Mr. Caldwell can't stop it, Mr. Patel can't stop it, Mr. Faxér can't stop it.  Only you can.  And at its very core, that's why we're here is to ask you to stop this.  It's ultimately your decision, not ours, but certainly that's what we would ask you to do.

Regardless of what you do, these folks over here are very appreciative for you giving them the opportunity to defend themselves.  Thank you.

And thank you, Your Honor.

THE COURT:  All right.  Plaintiff may now present its final closing argument.  You have 12 minutes and 48 seconds remaining, Ms. Fair.  Would you like a warning on your time?

MS. FAIR:  Two minutes, please, Your Honor.

THE COURT:  All right.  I'll warn you with two minutes remaining.

You may proceed.

MS. FAIR:  Thank you, Your Honor.

Good morning.  I was the first lawyer who got to visit with you on Monday and I'm the last one that you have to listen to, and I want to start by saying that we agree that the patent system needs protection.  You are the only ones who can protect that property.

This case is about T-Mobile's infringement, and they've

talked to you about all kinds of analogies for every issue in this case. We heard about cookies, weeds in a garden. We heard about baking bread. We heard about a lawyer calling his wife in the grocery store. We heard about soccer balls. We heard about belt and suspenders. We just heard about a freight train.

You simply need to decide, what's more likely in this case? Is the '803 Patent a game changer for all the awards, the press releases, the marketing, the tests, the source code that's undisputedly on tens of thousands of base stations, or according to the Defendant, the '803 doesn't have any or very little value?

We believe we've shown that the '803 Patent is what Stout recognized that it was before T-Mobile started paying Ms. Bennis--a game changer. Core functionality. It's an invention that should be protected, and it's an invention that should be rewarded for the spectral efficiency that it provides to T-Mobile.

Now, I don't have time to respond to everything that we just heard from Mr. Dacus, but I do want to address each of the questions you're going to be asked.

The first one, infringement, Mr. Anaipakos walked you through the evidence. And so what's their story? Well, they took a figure with three or four phones on it and they said -- they got Dr. Van der Weide and they said, well, if another

1286

phone happens to be here or there, a signal could hit it and therefore there's no infringement.  They want to tell you if there's phones, more than three or four in this system, well, there just can't be infringement because these signals, they propagate out.  Does that make sense to you?

This patent is about a communications system.  Do you really think it's limited to a system that can only work with three or four phones in it?  They showed you these blobs. They tried to convince you that means these signals are sent out arbitrarily.

But remember when Mr. Alavi was cross-examining Dr. Van der Weide, and he had to admit that the way that those blobs work is anything but arbitrary.  It's an antenna gain plot, and it's just plotting exactly what we saw these beams do. When they ricochet off of buildings, they go to the phone they're directed to.

And the base station does that with all of the signals, all of the signals, that it received.  It puts them together. It's really sophisticated.  It inverts the whole thing and creates a beam that retraces each one of those pathways in exactly the same way that it went and arrived at the base station.  This is not an accident.  They are directing these beams to the phone they're intended for and not other phones.

The answer to the first question that you're asked, Have we proven that these systems infringe claim 12 of the '803

1287

Patent?  Yes, we have.

The next question you're asked about is invalidity.

Ms. Brunson, may we have the slides again, please?  Thank you.

Remember they started priming you for this one early telling you these are preliminarily granted patents.  They brought you Dr. Van der Weide.  The man who every time he has been asked by the telecommunications industry, he has said every patent asserted against them is invalid 100 percent of the time.

And use your common sense.  T-Mobile and Ericsson and Nokia did not get these features, these infringing features, implemented into their systems until 2022, years after this patent.  If it was so obvious, why did it take them so long to get there?  On written description, the Patent Office had everything in front of it--the original claims, the specification, and a trained examiner who spent six years and more than 600 pages looking at this patent.  Do you have an abiding conviction to invalidate a property right?

The answer to Question No. 2 is no.  The Defendants have not proven that these -- this claim of this patent is invalid.

The next question you're going to be asked is about the license.  Up until today, you had not heard the term 'exhaustion' in this trial; not once.  The very first time it came up was in the Court's instructions.  They acted like,

1288

Well, if Nokia's licensed, then T-Mobile, the actual infringer in this case, gets the benefit of it, but that's not the way the law works.  The Court just told us that for the defense of exhaustion there's two requirements.  They never even talked about the second requirement.  This is a defense that they have the burden on.  Have they proven to you that Nokia and T-Mobile are exhausted?

The first thing that they would have to prove on essentiality.  I want to talk about that.  They're all saying it is essential; it's not essential; they -- Nokia was on the whitelist or not on the whitelist.  Mitsubishi itself said this patent is not standard essential.  But one thing that you can tell here is an attempt at misdirection.  I want to talk about that.

Dr. Feuerstein testified--you saw the testimony--there are no commercially-available non-infringing alternatives to the patent.  And Mr. Patel, a lawyer on the stand, testified he knows that's something different than essential to the standard.  And you can know that, too, because the Court's instructions on commercially-acceptable non-infringing alternatives to the patent are on page 29 of the jury instructions for damages--a reasonable royalty; not exhaustion, not license.  They thought you would fall for it. They tried to confuse you.

Every person in this courtroom agrees that T-Mobile had a

1289

5G network that was commercially-viable before 2022 when they released the infringing features, and that means the 5G network does not require the '803 Patent.  It's not essential; it's an improvement on the standard.

The answer to Question 3 is they have not proven exhaustion.  They have not proven that T-Mobile is exhausted.

Damages, the last thing you're going to be asked about.  You got to hand it to them.  They found an expert to wave her hands around, talk about some settlements and home shopping.  And it made sense.  Right?  Look at some comps.  We're not shopping for homes.  This is a patent case, and the damages statute gives us our assignment.  We're looking for use made of the invention by the infringer.  The user here is T-Mobile.

And they used this patent in the infringing features, RAT and RAIT.  It's not about Nokia and Ericsson.  Exxon doesn't get to cap your royalties based on its equipment suppliers, and T-Mobile doesn't get to do that here.

We've been telling you this all week, and now you've heard it from the Court.  The hypothetical negotiation puts two people at the table--the licensor, Mitsubishi, and on the other side of that table is T-Mobile.  T-Mobile.  That is what Mr. Dell did.  This was his slide of the hypothetical negotiation.

THE COURT:  Two minutes remaining.

MS. FAIR:  Thank you, Your Honor.

Ms. Bennis added some placards so that she could bring in some of Nokia and Ericsson's low-dollar settlements and make a bar chart that she thought would convince you.  We don't need to nitpick those settlement agreements when they started in the wrong place to begin with.

Their favorite criticism of Mr. Dell was that "Click It or Ticket" document, and I want to say something about that.  They don't want to tell you, they're hoping you'll forget, that their own documents showed the same percentage.  That was the 14.9 percent input into his calculation.  The Ericsson PX 78, they did their own study on data traffic and got the same result.  Dense urban uplink traffic is around 14 percent of total traffic.

There was one expert who put T-Mobile at the hypothetical negotiation and measured T-Mobile's use of the invention, and that was Mr. Dell.

For damages, for Nokia it's $81,965,972.  And on the next page, for Ericsson, it's $99,503,119.

When someone is on your property, you call the sheriff.

THE COURT:  Your time's expired, counsel.  Take a few seconds and finish up.

MS. FAIR:  Yes, Your Honor.

When someone's on your patent, it's you, the jury, you are the only people who can hold them accountable.  You are the only one who can tell them it's time to pay for their use.

We look forward to your verdict.

THE COURT:  All right.  Ladies and gentlemen, I need to provide you with a very few final instructions before you begin your deliberations.

You should perform your duty as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties in this case expect that you will carefully and impartially consider all the evidence, follow the law as the Court has given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the Court's instructions which I have given you on the law.  Again, do not decide who you think should win this case and then answer the questions to reach that result.  One more time, your answers to the questions in the verdict form must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, holding the same or similar stations in life.  This is true even where one party is small and the other party is large.  This applies in patent cases because all corporations, partnerships, and individuals stand equal before the law.

A patent owner is entitled to protect its rights under the laws of the United States, and this includes bringing a

suit in a United States District Court for money damages when it believes infringement has occurred.  By the same token, an accused infringer is entitled to defend itself against assertions of infringement, including by arguing that it does not infringe and that the asserted patents are invalid.  The law recognizes no distinctions between types of parties.

Now, when you retire to the jury room to deliberate on your verdict, as I've told you, you are each going to have your own printed copy of these final jury instructions.

If during your deliberations you desire to review any of the exhibits which the Court has admitted into evidence, you should advise me by a written note signed by your foreperson and deliver to the Court Security Officer.  I'll then send you that exhibit or those exhibits.  However, again, ladies and gentlemen, demonstratives that have been shown to you during the trial are not exhibits and I will not be able to send those to you during your deliberations.

Now, once you retire, you should select your foreperson and then conduct your deliberations.  If you recess during your deliberations for any reason, follow all the instructions that the Court has given you about your conduct during the trial.

After you reach a verdict, your foreperson should fill in your unanimous answers to the questions in the verdict form, sign it, date it on behalf of the jury, and then advise the

1293

Court Security Officer you have reached a verdict.  Do not reveal your answers until such time as you're discharged by me, unless otherwise directed, and you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Let me remind you, any notes you have taken over the course of this trial are aids to your memory only.  If your memory should differ from your notes, rely on your memory and not your notes.  The notes are not evidence, and a juror who has not taken notes or who has taken very few notes must still rely on their own independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror who took them about the testimony.

Now, if you want to communicate with me at any time during during your deliberations, you should give a written message or a question to the Court Security Officer.  That question or message should be written, signed, and dated by your foreperson.

The Court Security Officer will then bring it to me, and I will respond as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  And I will always first disclose to the attorneys in the case for all the parties your question and my

1294

intended answer before I respond to any question you might send me.

Now, after you have reached a verdict and I have accepted your verdict and discharged you as jurors, you are not required to talk to anyone about your experience as a juror in this case, but at that point in time, ladies and gentlemen, by the same token you will be completely free to talk to anyone you would like to about your experience as a juror in this case.  That decision at that time will be 100 percent up to you and you alone.

I'm now going to hand eight printed copies of these final jury instructions and one clean copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict.  We await --

THE COURT SECURITY OFFICER:  All rise.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel.  Awaiting either a note from the jury or the return of their verdict, we stand in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury. I'll read it and it is as follows:  "The exhibits from Melissa Bennis with the four license from IP Bridge.  UCSD."

Then there's a couple of spaces, and the note continues: "George wants the transcript from Melissa Bennis."

Then it's signed by Ms. Weller, Juror No. 2 as the apparent foreperson for the jury.

I'm going to mark this with a '1' in the upper right-hand corner for identification, and I'm going to hand the original note to the Courtroom Deputy.

Counsel, we've looked through the exhibits while you were coming to the courthouse after I received the note. I think what the jury's asking for is DX 19, DX 20, DX 21, and JX 24, but I want you to meet and confer briefly. We're going to go off the record, and once you've met and conferred then we'll come back on the record and discuss whether these are, in fact, the exhibits reflective of what's requested in the note, or there's a difference of opinion about what should or shouldn't go back to the jury.

I also have a printed copy of the note from the jury, and -- I actually have two copies for each side, and I'll give those copies to Ms. Brunson. Once we're off the record, you can get a copy so it will help you as we discuss where we are.

Let's go off the record at this time.

(Pause in proceedings.)

THE COURT: All right. Then let's go back on the record.

Having met and conferred among yourselves, counsel, do we

1296

have a consensus about the exact and precise exhibits that the jury's requesting?

MR. DACUS:  Yes, Your Honor.  We agree it's DX 19, DX 20, DX 21, and JX 24.

THE COURT:  You agree with that on behalf of Plaintiff, Ms. Fair?

MS. FAIR:  Yes, Your Honor.

THE COURT:  Okay.  I'll prepare a short cover letter or single page to go with this telling the jury that in response to their request I am sending them these exhibits.  I will also tell them that I cannot send them any portion of the transcript from the trial and they'll have to rely on their memory of the evidence.

Anybody have a problem with me doing that and then sending these four exhibits back with that memorandum or note to the jury in response to their question?

MS. FAIR:  No from the Plaintiff, Your Honor.

MR. DACUS:  No from Defendants.

THE COURT:  Okay.  I have not prepared that written response to go with these.  I'll do that.  I would also like to see briefly in chambers Mr. Alavi, Mr. Anaipakos, Ms. Fair, Mr. Lipschitz, Mr. Dacus, and Mr. Mathews.  All right?

Court stands in recess.

(Deliberations continue.)

THE COURT:  With seated, please.

Counsel, as I've already discussed with you in chambers I received a subsequent note from the jury.  I'll read it into the record and then I'll give it to the Courtroom Deputy.  And I'll mark it with a '2' in the upper right-hand corner by way of identification.

The note from the jury reads as follows:  "We cannot read an agreement!"

Signed and dated today by Ms. Weller as foreperson.

I'll hand the original note to the Courtroom Deputy.

As we've discussed in chambers, it's my intention to give a straightforward *Allen* charge to the jury.  Does anybody on either side have any objection to the Court giving an *Allen* charge to the jury at this time?

MS. FAIR:  No, Your Honor.

MR. DACUS:  Neither does the Defendant, Your Honor. Thank you.

THE COURT:  All right.  Mr. Barnett, bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please have a seat, members of the jury.

I've received your note that says "We cannot reach an agreement!"  I'm going to ask you to continue your deliberations in an effort to reach an agreement upon a verdict and dispose of this case, and as a part of that I have some additional comments I'd like you to consider.

1298

This is an important case, ladies and gentlemen.  This trial has been expensive in time, effort, money, and emotional strain on both the Plaintiff Daingean as well as the Defendant T-Mobile and the two Intervenors Ericsson and Nokia.  If you should ultimately fail to agree upon a verdict, the case will remain unresolved and will likely have to be tried again.

Obviously another trial would only serve to increase the burden and the cost to all the parties, and there is no reason to believe that this case can be tried again by either side any better or more exhaustively than it has been tried before you.  Any future jury must be selected in the same manner and from the same pool of citizens as you were chosen from, and there is no reason to believe that the case could ever be submitted to another jury of men and women more conscientious, impartial, or competent than you are to decide this case.  There is also no reason to believe that another trial would be -- would produce more or clearer evidence than has been produced in this trial.

As jurors you have a duty to discuss the case with each other and to deliberate in an effort to reach a unanimous verdict, if each of you can do so, without violating your own independent judgment and conscience.  Each of you must decide the case for yourself, but only after you consider all the evidence impartially with all of your fellow jurors.

During your deliberations you should not hesitate to

re-examine your own views and change your opinion if you become persuaded that you were wrong.  You should not, however, change an honest belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of reaching a verdict.

I also remind you that your deliberations -- that in your deliberations you are to consider the instructions that I have given you as a whole.  You should not single out any part of any instruction, including this one, and ignore the other instructions.  They are all equally important.

What I have just said is not meant to rush you or to pressure you into agreeing on a verdict, but to simply remind you of the importance of your job as jurors and what is at stake.

I'm now going to direct that you retire again to continue your deliberations with these additional comments in mind and in conjunction with all the other instructions I've previously given you.

You should now return to the jury room and continue your deliberations, ladies and gentlemen.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel.  Be seated.

You're welcome to stay here in the courtroom.  You're welcome to be off premises where you have been.

It's five minutes until 3:00.  As we discussed in

1300

chambers, if we get to 4:00 and we've not heard anything further from the jury, it's my intention, as I understand counsel have agreed with the Court, that I should give an additional instruction to them letting them know that they are going to have to come back Monday and continue to deliberate if they don't reach a verdict today.

But you're welcome to wait for the next hour.  I may get a note between now and then.  You're also welcome to be off premises.  Just keep your cell phones on and handy so we can get you back here quickly if we need to.

Any questions from either side?

Anything from Plaintiff?

MS. FAIR:  No, Your Honor.

THE COURT:  From Defendant and Intervenors?

MR. DACUS:  No, Your Honor.

THE COURT:  We stand in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

Counsel, I've received another note from the jury.  I'm going to mark it as -- what are we up to, Ms. Brunson?  3?  I'll mark it with a '3' in the upper right-hand corner for identification.  I'll read it to you -- I'll read it into the record, and then I have two copies for each side to take a look at.

This note from the jury is as follows:  "1.  Nokia email

about not being added to the whitelist.

"2.  "Nokia's base beamforming and the interference pictures, exhibits like how it's formed.

"3.  Ericsson base beamforming exhibits how it's formed."

And it's signed by Ms. Weller as foreperson.

That's the sum total of the note.  I'll hand it to Ms. Brunson.

If you want to approach, I have two Xerox copies of the same note for each side.

My thought is we probably need to go off the record and let you-all have a discussion about what they are or are not asking for here.

With that, we'll go off the record so counsel can confer.

(Pause in proceedings.)

THE COURT:  Let's go back on the record and you can tell me what the disputes are.

All right, counsel.  We're going to go back on the record.

Now, based on discussions that you've had with each other and with the Court while we were off the record, it's my understanding that the following exhibits are agreed to by the parties as responsive to the jury's note No. 3 being:  DX 99, JX 5, JX 16, JX 11, JX 14, JX 12, PX 6, PX 8, PX 16, PX 18, PX 60, PX 41, PX 13, and PX 46.  Does anybody disagree with that rendition?

1302

MS. FAIR:  That is the agreed list, Your Honor, yes.

THE COURT:  All right.  Now, identify for me the five or six remaining exhibits that Plaintiff believes should go back and Defendants believe should not.

MR. HEIM:  Yes, Your Honor.  Plaintiff's Exhibit 14, Joint Exhibit 3, Joint Exhibit 6, Joint Exhibit 7 and Joint Exhibit 13.

THE COURT:  All right.  Let's take them one at a time.  PX 14.  Why does Defendant oppose that?  Why does Plaintiff suggest it should go back.  What's Defendant say first?  You're the ones objecting, apparently.

And I will admit for everybody and on the record, the reason we're having a lack of complete unanimity here is that the note is very vague and imprecise, and both sides are doing their best to be responsive to it.

Px 14, what is it?

MR. MATHEWS:  So, Your Honor, this is an algorithm specification document that doesn't show pictures of beams or anything like that.  It's a very dense, detailed technical document.  And so I can just scroll through --

THE COURT:  How many pages is it, Mr. Mathews?

MR. MATHEWS:  The table of contents suggests this one alone is 96 pages.

And just to give Your Honor a flavor, you know, this isn't one of those glossies that has pictures of beams or

1303

anything like that.  This is very, very dense, not called for in the jury's note.

And all of the ones that we're objecting to are like this kind of document where it's not responsive to the note that asks about the formation of the beam.

THE COURT:  Does anybody believe any portion of this was expressly exhibited to the jury during the trial?

MR. HEIM:  Yes, Your Honor.

THE COURT:  All right.  Tell me your position, Mr. Heim.

What is it, Mr. Bullwinkel?

MR. BULLWINKEL:  Your Honor, PX 14 was relied on to show the operation of the EIS beamforming.  And specifically for limitations [E] and [F], the SRS processing that's described right here, this was explicitly shown to and discussed by -- shown to the jury and discussed by Dr. Feuerstein, the calculation of the SRS residual and and explanation of how that residual is used to do to beamforming.

THE COURT:  And that is what page out of this document?

MR. BULLWINKEL:  This is on page 44 of PX 14.

THE COURT:  All right.

MR. BULLWINKEL:  And then, finally, Your Honor, the calculation of the interference amount is discussed on page 45 as well as the following page 46.

1304

THE COURT: Are you telling me that mathematical formula was shown to the jury?

MR. BULLWINKEL: That formula was not, but the discussion of the calculation of ICM on page 45, it was, yes, Your Honor.

THE COURT: Pull that up a little bit, please.

MR. BULLWINKEL: Yes. It explains that this is the covariance matrix of the residual and it's for the gNodeB or base station beams.

THE COURT: I'm inclined to send page 44 back, but it will be the only page out of this document. I can't believe that formula is going to be of any use to the jury, and certainly if they have that particular mathematical formula in their minds and they don't see it, they can sure send me another note and ask for it, but I don't see any benefit of sending a hundred-page document back that perhaps there's been one page shown to the jury.

MR. MATHEWS: May I respond, Your Honor?

THE COURT: Okay.

MR. MATHEWS: If Your Honor is inclined to send back the page, we would rather just send back the entire document rather than draw attention to that one formula. I mean, if you look at their note, they're asking for beamforming and their interference pictures, exhibits like how it formed. And so our preference would not be to spotlight what they

cherry-picked out of these documents.

THE COURT:  Okay.  I understand that.

All right.  I'm not going send PX 14 back.  If the jury wants it or if they think that what I'm sending them in these 14 other exhibits--and there may be more added to them--if they think that's insufficient, they are certainly free to send another note and ask for something else.

Again, the problem we are having is caused by the imprecision and lack of specificity in the jury's note.  But I'm not persuaded that PX 14 fits the requests in the note.

What's the issue on JX 3?

MR. MATHEWS:  Your Honor, who would you like to hear from first?

THE COURT:  I don't care.  I'm going to hear from both sides eventually.

MR. MATHEWS:  Your Honor, JX 3 is a very similar issue; again, not responsive to the issue regarding pictures of beams; very, very dense algorithm specification docs. There are some flowcharts like this, but nothing about the beamforming pictures, how they're formed like the jury requests.  And this is just throughout, this sort of level of detail, equations, things like that, nothing more.

THE COURT:  What's the length of this document?

MR. MATHEWS:  It's 22 pages.

THE COURT:  Put it back on the elmo, if you will,

1306

Mr. Mathews.  Go back to the beginning of it.  Scroll down slowly.  Keep going.  Keep going.  There's a diagram in there that I remember seeing during the trial.

MR. MATHEWS:  Sure.  Tell me when to stop.

THE COURT:  Right there.  I'll send this back to the jury.  I think that was shown.  It may be what they're looking for, it may not, but I'll add JX 3.

MR. MATHEWS:  Certainly.

THE COURT:  Where are we on JX 6?

MR. HEIM:  Your Honor, JX 6, here's the title of the document.  This is the algorithm for the downlink beamforming controller which we referred to at length throughout the presentation.  And just to give Your Honor a flavor, I think you'll recall this figure that actually describes the flowchart with the beamforming controller that we used with the weights calculation in this area here that was used.  So this is right at the heart of the beamforming and it was used extensively during the presentation.

THE COURT:  What's Defendants' objection to this, Mr. Mathews?

MR. MATHEWS:  Similar to the fact that it's not showing the beamforming pictures that they requested.  These seem to be algorithm specification documents, and that is the objection.

THE COURT:  Well, the jury's note doesn't say, Send

us pictures.  They're not that precise.  It does relate to beamforming.  I'm not at all convinced that's what they want, but I don't think it does any harm to send it back.  I'll send back JX 6.

What about JX 7?

MR. HEIM:  So, Your Honor, this is the companion document to the beamforming controller we just saw.  Again, we referred to it extensively as the NR sounding reference symbol receiver.  That's the SRS receiver.  We referred to it quite a bit during the presentation.

And I just lost the page.

But this figure was used extensively, extensively, Your Honor, and it shows the SRS signals coming in over here and, critically, it shows the IpN values being calculated down here, which was a big part of the Ericsson MIMO presentations.

THE COURT:  All right.  What's your position, Mr. Mathews?

MR. MATHEWS:  Yes, Your Honor.

Based on your prior ruling, I suspect this would rise and fall as well.  I think what's driving this is there's a lot of paper that's going back, and our concern is what we think they're asking for is going to get lost with this mountain of paper that's going back.  And so that's the concern, I'll note, but I'll acknowledge this will likely rise and fall based with your prior ruling.

1308

THE COURT:  I'm going send JX 7 back.  I don't think PX 14 is anywhere close to what they asked for.  If there is a legitimate question I'm inclined to send it back.  If it's not what they want, they can disregard it.  If they don't get what they want, they can ask for more.

What's the story on JX 13?

MR. HEIM:  Your Honor, JX 13 I think is a little more -- it's similar to the very first one you ruled on, PX 14.  I would say it's a massive MIMO algorithm specification from Nokia.  We cited to just one page out of there that talked about processing on window averaging filtering.  I think this would rise and fall with your first decision.

THE COURT:  Then it will stay out.

So -- all right.  I have 16 exhibits.  I'm going to read them.  If anybody feels like I've overlooked something, let me know.

And do we have the physical exhibits already pulled out?  Do we have a box we can put all of them in so that we can get this ready to go back.

MR. MATHEWS:  We would need to double check, Your Honor, and go through because I think we are missing a couple.

THE COURT:  All right.  I'm going to call the exhibit numbers out that I'm going to send back in response to this note.  I want counsel for both sides to put your hands on

1309

the physical exhibits while I'm doing it and make sure the

right exhibits are all in the same box.  Okay?

All right.  I have DDX 99--DX 99; I'm sorry--I have

JX 3, I have JX 5, I have JX 16, I have JX 11, JX 14, JX 12,

PX 6, PX 8, PX 16, PX 18, PX 60, PX 41, PX 13, PX 46.

MR. DACUS:  The only other thing I would add, Your

Honor --

THE COURT:  We're not through.  Just a minute.

And JX 6.

MR. HEIM:  Your Honor, I think we also had -- JX 7

was the additional one we had just done.

THE COURT:  Yes.  We need to put JX 7 in there.

MR. HEIM:  Your Honor, may I approach to put these

back in?

THE COURT:  Just a minute.  We also need to put

JX 23 in there, which is the Nokia email about not being added

to the whitelist.  Nobody had that on your list, but that

looks like to me that needs to be in there.

MR. DACUS:  That's right.

THE COURT:  All right.  I'll add JX 23 to the list.

MS. TRUELOVE:  May I approach, Your Honor?

THE COURT:  All right.  I have a written note to go

back to the jury itemizing the list of exhibits.  I'll direct

it be placed in the box with the physical exhibits.

And then, Mr. Barnett, if you'll come get this box with

1310

the note and return it or deliver it to the jury, please.

And Ms. Brunson, here's a duplicate of written response regarding Note No. 3.

Now, before you go back to see the jury, Mr. Barnett, counsel it's 4:34 according to the clock I have here on the bench. My suggestion would be to have Mr. Barnett tell the jury when he delivers this box that they are to deliberate until 5:00; that 5:00 they're to go home and be back at 8:30 Monday morning. Anybody have a problem?

MS. FAIR: The Plaintiff does not, Your Honor.

MR. DACUS: I guess our only suggestion, Your Honor, to the Court potentially is, given that they've asked for these, that they deliberate until 6:00 tonight.

THE COURT: It's Friday, it's been a long week. I don't know about you-all; I have responsibilities this evening.

MR. DACUS: That's fine, Your Honor.

THE COURT: 5:00 is as late as I'm prepared to keep them today.

MR. DACUS: We have no objection.

THE COURT: Tell them to work till 5:00, and if they don't have a verdict by 5:00, be back Monday morning at 8:30 sharp.

All right, counsel. Awaiting either another note from the jury or, hopefully, the return of their verdict, we stand

in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

Counsel, we have a fifth note from the jury.  I'll mark it -- or fourth note.  I'll mark it as item '4' for identification.  I'll read it into the record then I'll hand it to the Courtroom Deputy.

The note reads as follows:  "Can we extend the time to at least 6:30 due to a cruise scheduled Monday?  We all agree to time in staying."

Signed by Ms. Weller as foreperson.

I'll hand the original note to the Courtroom Deputy.

Here's my intended response.  "In response to Jury Note No. 4, I am not prepared to keep all the court personnel here that are required while you deliberate after 6:00 p.m. on this Friday evening.  If you have not reached a verdict by that time, you should recess until Monday and return at 8:30 to continue your deliberations then."

Also, counsel, you should know, based on staffing and some of the work requirements of our court security staff, if I do this, you're going to have to stay in this room like I am, or in this building, until 6:00.  You're not going to be able to come and go because we won't have enough staff to do the screening up front.

Plaintiff have any problem with this?

1312

MS. FAIR:  No, Your Honor.

THE COURT:  Defendant?  You're the one that wanted to stay late earlier.

MR. DACUS:  No, we don't have any problem with it. I wanted to make sure we had all of our clients here in the building.

THE COURT:  Well, if you need anybody in here that's not here --

It's after 5:00.  Can they come in?  Probably not.

You got a telephone?

MR. DACUS:  Yes, sir.

THE COURT:  If you need to communicate with a client who's not physically present, you'll need to do it by telephone.

MR. DACUS:  Okay.  We will do that.  Thank you.

THE COURT:  Okay.  Mr. Barnett, here's a signed original of this note.  Please take it to the jury.

And Ms. Brunson, here's a signed copy of the note for the Court's files.

And counsel, I have two additional copies if you would like a copy for your own files.

With that, we stand in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

Counsel, I've received the following message from the

jury.  It says, "We have reached a verdict."

I'll hand the original note to the Courtroom Deputy.

Is there anything I need to hear from any of the parties on before I bring in the jury and receive their verdict?

MS. FAIR:  Not from the Plaintiff, Your Honor.

MR. DACUS:  Not from Defendants, Your Honor.

THE COURT:  Let's bring in the jury, please, Mr. Barnett.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

Ms. Weller, I understand you're the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  We have, Your Honor.

THE COURT:  Would you hand the completed verdict form to the Court Security Officer who will bring it to me?

Ladies and gentlemen of the jury, I'm about to announce the verdict into the record.  I'd like each one of you to listen very carefully as I do that, because after I have announced the verdict into the record, I'm going to poll the members of the jury to ensure that this is, in fact, the unanimous verdict of all eight members of the jury.

Turning to the verdict form and beginning on page 4 with Question 1A, "Did Daingean prove by a preponderance of the

1314

evidence that T-Mobile infringed claim 12 of the '803 Patent through the use of Nokia base stations?"

The jury's answer is, "No."

Question 1B, "Did Daingean prove by a preponderance of the evidence that T-Mobile infringed claim 12 of the '803 Patent through the use of Ericsson base stations?"

The jury's answer is, "Yes."

Turning, then, to page 6 where Question 2 is found, "Did Defendants prove by clear and convincing evidence that claim 12 of the '803 Patent is invalid?"

The jury's answer is, "No."

Question 3 on page 7, "As to enforcement of the '803 patent regarding Nokia base stations sold to T-Mobile, and not considering any Ericsson base stations sold to T-Mobile, did T-Mobile and Nokia prove by a preponderance of the evidence that Daingean's right to enforce the '803 Patent was exhausted?"

The jury's answer is, "No."

Question 4A, what sum of money, if paid now in cash as a lump sum, do you find from a preponderance of the evidence would compensate Daingean for any infringement of claim 12 of the '803 Patent by T-Mobile's use of Nokia base stations?"

And the jury has put "0" in that blank since they did not find infringement.

Question 4B on page 9 of the verdict form, "What sum of

money, if paid now in cash as a lump sum, do you find from a preponderance of the evidence would compensate Daingean for any infringement of claim 12 of the '803 Patent by T-Mobile's use of Ericsson base stations?"

The jury's answer is "$2 million."

Turning, then, to page 10, which is the last page of the verdict form, I find it is dated with today's date, July the 11th, 2025, and it is signed by Ms. Weller as foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you to make sure that this verdict as I have read it into the record unanimously reflects the entire agreement of all eight members of the jury. If this is your verdict as I have read it, would you please stand up? Thank you, ladies and gentlemen, please be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury. This confirms that this is the unanimous verdict of all eight members of the jury.

The Court accepts the jury's verdict, and I'll deliver the original verdict form to the Courtroom Deputy.

Ladies and gentlemen, this now completes the trial of this case. From the very beginning I have given you repeated instructions about your conduct, all the things you can do, all the things you can't do. Having accepted your verdict, I

1316

am releasing you as jurors, discharging you as jurors, and you are no longer subject to any of those restrictions or instructions. Said another way, you are completely free to talk with anybody you want to about your service as a juror in this case, and by the very same token, you are under no obligation to talk to anybody that you don't want to talk to about your experience as jurors in this case. It is 100 percent up to you.

I would like to ask a favor of you. I know it's been a long week, I know everybody's ready to go, and I promise you I am, too, but when you get up in just a second, rather than leave the building, I'd like to ask you as a personal favor to go back into the jury room and let me come into the jury room because I would like to shake each hand and I'd like to look each juror in the eye and thank you face-to-face for your service in this case.

This has been a hard trial, this has been a difficult decision, you have worked hard, and you have rendered very real and important public service, and I think that warrants just a moment to personally thank each one of you before you leave to go on your merry way.

I promise I won't keep you--believe me, I am ready to be out of here, too--but I do think it's important enough to take just a moment and personally express the Court's thanks and appreciation to each one of you before you leave.

So if you'll do me that favor, I will meet you in the jury room.  You're excused, ladies and gentlemen.

Counsel, that completes the trial of this case.  You are excused.

(The proceedings were concluded at 6:05 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A

CORRECT TRANSCRIPT FROM THE RECORD OF

PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

COURT AND THE JUDICIAL CONFERENCE OF THE

UNITED STATES.


S/Shawn McRoberts              07/11/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER